STOCKTON, Atty. Gen. of New Jersey, *v.* BALTIMORE & N. Y. R. Co. and others.

*(Circuit Court, D. New Jersey.* August 1, 1887.)

1. CONSTITUTIONAL LAW — POWER "TO REGULATE COMMERCE" — INTERSTATE BRIDGE.

The act of congress of June 16, 1886, authorizing the Staten Island Rapid Transit Company, a corporation of New York, and the Baltimore & New York Railroad Company, a corporation of New Jersey, or either of them, to construct and maintain a railroad bridge across the Staten Island sound, known as "Arthur Kill," and establishing "the same as a post-road," is within the power "to regulate commerce" vested in congress by the constitution of the United States, it being competent for congress, under that grant of power, to open up commercial communication between different states, by land as well as by water.[1]

2. SAME—CONSENT OF THE STATES.

The power of congress in this respect being supreme, and the act in plain terms granting authority to build the bridge, the privilege is not promissory in its character, and may be exercised without the consent or concurrence of the states in which the structure is authorized by the act to be placed.

3. SAME—GRANT CONSTRUED.

The grant by congress, in the exercise of its power to regulate commerce, of the privilege of erecting and maintaining a bridge across navigable water, from one state to another, is, in effect, a grant of the mere use of the soil needed for the structure, and not an assumption of exclusive jurisdiction over such territory. Cession of the soil by the state in which the land lies is, therefore, not necessary to the exercise of the privilege.

4. SAME—CORPORATIONS—CITIZENS OF ANOTHER STATE—FOURTEENTH AMENDMENT.

The New Jersey act of April 6, 1886, prohibiting any person or corporation from erecting any bridge, etc., over or in any part of the navigable waters where the tide ebbs and flows, and separating that state from other states, without permission from the legislature of that state, is unconstitutional so far as it is sought to be put into operation against the Staten Island Rapid Transit Company, a corporation of New York, claiming to exercise the privilege conferred upon it by the act of congress of June 16, 1886, of erecting and maintaining a railroad across Staten Island sound, or "Arthur Kill."

5. EMINENT DOMAIN—LITTORAL RIGHTS—STATE AND FEDERAL JURISDICTION.

The shore and lands under water of the navigable streams and waters of New Jersey, which, prior to the Revolution, belonged to the king of Great Britain as part of the *jura regalia* of the crown, passed to the state at the close of that war, but the state succeeded to them as trustee of the people at large; and, the right of the state therein not being such property as is susceptible of pecuniary compensation, it is not "private property," within the meaning of Const. U. S. amend. 5, providing that private property shall not be taken for public use without just compensation.

On Bill for Injunction.

*John P. Stockton,* Atty. Gen., *Barker Gummere,* and *Cortlandt Parker,* for informant.

*A. Q. Keasbey* and *W. W. Macfarland,* for defendants.

BRADLEY, Justice. This case was commenced by information filed by the attorney general of New Jersey, in the court of chancery of that

---

[1] As to what is included under the term "commerce," within the meaning of the clause of the constitution granting the power to congress "to regulate commerce," see Head-Money Cases, 18 Fed. Rep. 135, and note; Memphis & L. R. R. Co. v. Nolan, 14 Fed. Rep. 534; Norfolk & W. R. Co. v. Com., 6 Atl. Rep. 45.

state, praying for an injunction to restrain the defendants from erecting a bridge across Arthur kill, between New Jersey and Staten island, in the state of New York, upon the lands of the state situate on the shore, and under the waters of said kill. The chancellor granted a preliminary injunction upon the bill and affidavits. The defendants have removed the case to this court, as one arising under the constitution and laws of the United States, and have filed an answer. Motion was then made to dissolve the injunction; but, after argument, the parties stipulated to submit the case as upon final hearing on bill and answer. There are no controverted facts in the case.

The Staten Island Rapid Transit Railroad Company, a corporation of New York, one of the defendants, claims the right to build the bridge in question, and to occupy the lands under water necessary for the support of its piers, under an act of congress, approved June 16, 1886, entitled "An act to authorize the construction of a bridge across the Staten Island sound, known as 'Arthur Kill,' and to establish the same as a post-road." This act declares:

"Section 1. That it shall be lawful for the Staten Island Rapid Transit Company, a corporation existing under the laws of the state of New York, and the Baltimore & New York Railroad Company, a corporation existing under the laws of the state of New Jersey, or either of said companies, to build and maintain a bridge across the Staten Island sound, or Arthur kill, from New Jersey to Richmond county, New York, for the passage of railroad trains, engines, and cars thereon, and to lay on and over said bridge railway tracks for the more perfect connection of any railroads that are or shall be constructed to the said sound at or opposite said point; and in case of any litigation concerning any alleged obstruction to the free navigation of said sound on account of said bridge, the cause may be tried before the circuit court of the United States of either of said states in which any portion of said obstruction or bridge touches, and that all railway companies desiring to use the said bridge shall have and be entitled to equal rights and privileges in the passage over the same, and in the use of the machinery and fixtures thereof, and of all the approaches thereto, for a reasonable compensation, to be paid to the owners of said bridge under and upon such terms and conditions as shall be prescribed by the secretary of war upon hearing the allegations and proofs of the parties, in case they shall not agree.

"Sec. 2. That said bridge shall be constructed as a pivot draw-bridge, with a draw over the main channel of the sound at an accessible and navigable point, and with spans of not less than two hundred feet in length in the clear on each side of the central or pivot pier of the draw; and said spans shall not be less than thirty-two feet above mean low-water mark, measuring to the lowest member of the bridge superstructure; and provided also, that said draw shall be opened promptly, upon signal, except when trains are passing over the said bridge, for the passage of boats whose construction shall not be such as to admit of their passage under the draw of said bridge when closed; but in no case shall unnecessary delay occur in opening the said draw after the passage of trains; and the said company or corporation shall maintain, at its own expense, from sunset to sunrise, such lights or other signals on said bridge as the light-house board shall prescribe.

"Sec. 3. That any bridge constructed under this act, and according to its limitations, shall be a lawful structure, and shall be recognized and known as a post-route, upon which, also, no higher charge shall be made for the transmission over the same of the mails, the troops, and the munitions of war

of the United States than the rate per mile paid for their transportation over the railroads or public highways leading to said bridge; and the United States shall have the right of way for postal telegraph purposes across said bridge.

"Sec. 4. That the plan and location of said bridge, with a detailed map of the sound at the proposed site of the bridge, and near thereto, exhibiting the depths and currents, shall be submitted to the secretary of war for his approval, and, until he approve the plan and location of said bridge, it shall not be built; but, upon the approval of said plan by the secretary of war, the said companies, or either of them, may proceed to the erection of said bridge in conformity with said approved plan; and, should any change be made in the plan of said bridge during the progress of the work thereon, such change shall be subject likewise to the approval of the secretary of war. If the secretary of war shall at any time deem any change or alteration necessary in the said bridge so that the same shall not obstruct navigation, or if he shall think the removal of the whole structure necessary, the alteration so required, or the removal of the whole structure, shall be made at the expense of the parties owning said bridge. And if said bridge shall not be finished within two years from the passage of this act, the rights and privileges hereby granted shall determine and cease.

"Sec. 5. That the right to alter, amend, or repeal this act is hereby expressly reserved."

The said Staten Island Rapid Transit Railroad Company proposes to build a bridge across Arthur kill, under and in conformity with this act, to connect its own road on Staten Island with another railroad through and across the state of New Jersey, for the purpose of interstate transportation; and, in pursuance of that design, has adopted a site for the location of the bridge, from a certain point in the city of Elizabeth to Staten island; and has caused the plan and location of said bridge, with a detailed map of the sound at and near the same, (as required by the act,) to be submitted to the secretary of war, who has approved the same.

The company, by its engineer and contractors, (who are made co-defendants in the case,) proceeded to make preparations for laying the piers and erecting the bridge according to the plan thus approved. Thereupon the attorney general of New Jersey, deeming the property rights and sovereignty of the state in danger of violation from the erection of the proposed bridge, filed the present information to prevent it.

The information states the ordinary doctrine that the state is owner of the shore and land under water of all navigable streams and arms of the sea within its borders; that this ownership was a part of the *jura regalia* of the king of Great Britain, by virtue of which he was seized and possessed of an estate in fee-simple absolute in said lands; and that, at the Revolution, this state, in its sovereign capacity, succeeded to the rights of the crown, and that this right of supreme dominion had never been ceded or surrendered to the United States; and that, without such cession or surrender, the United States could not take possession of said lands, or authorize other parties to do so, except by making compensation therefor, as provided in the fifth amendment to the constitution; and that, at the place of location of the proposed bridge, their ownership of the soil, on the part of the state, extended from ordinary high-water mark to the center line of the sound, being the boundary line between New Jersey

and New York, as settled by agreement in 1833, and confirmed by act of congress, June 28, 1834.

The information further states that this ownership on the part of the state has been practically exercised by it for more than a century past, by regulating the enjoyment and disposition of the lands under the navigable waters within its limits, passing laws for the preservation and protection of the oyster fisheries therein, and authorizing the construction of wharves, with solid filling, to certain prescribed limits beyond low-water mark, and that for these privileges the grantees are required to pay and have paid a certain compensation to the state. It is contended by the informant that the act of congress cannot be construed as intending to give any authority to take any portion of said lands without compensation; that said act must be construed as a mere license or permission to erect the proposed bridge, so far as congress, the conservator of navigation, is concerned, leaving the companies to obtain from the state the usual authority to build the bridge on the territory and lands of the state; but that if the act should be construed as giving authority to erect the bridge without the consent of the state, and without compensation for taking its lands therefor, then it is violative of the constitution of the United States, not only for authorizing the lands of the state to be taken without compensation, but for enlarging the powers of a corporation created by the state itself, (if the bridge should be built by the Baltimore & New York Railroad Company,) and authorizing it to do what, by its own charter and other laws of the state, it is prohibited from doing.

The information further contends that the other corporation defendant, the Staten Island Rapid Transit Company, is not a corporation of New Jersey, and has no authority from the state to exercise any corporate franchises therein, and cannot lawfully do so, except by the comity of the state, which has not been accorded to it; that, instead of any such comity having been exercised, the said company is expressly prohibited from exercising any such powers or franchises as that of building said bridge by an act of the legislature of New Jersey, passed April 6, 1886, which prohibits any person or corporation from erecting any bridge, viaduct, or fixed structure over or in any part of the navigable waters where the tide ebbs and flows, and separating said state from other states, without permission of the legislature of New Jersey first given by statute for that purpose, and that no such permission has ever been asked or given.

The answer of the defendants does not advance any material new facts, except to state that the Baltimore & New York Railroad Company has nothing to do with the proposed building of the bridge, and that the Staten Island Rapid Transit Railroad company proposes to build it as a connecting link in a line of railroad extending from the bay of New York across the soil of the states of New York, New Jersey, Pennsylvania, and other states, as an instrument of commerce among the states, and claims the right to do so under the act of congress before recited.

The first question to be examined is the true construction of the act of congress on which the case arises,—the informant contending that it

is merely permissory in its character; and the defendants, that it gives authority and power to build a bridge, without reference to any authority from the state. This question need not detain us long. The words of the act are broad enough to confer the authority, if congress had power to confer it. The language is: "It shall be lawful for the Staten Island Rapid Transit Railroad Company," etc., "to build and maintain a bridge across the Staten Island sound, or Arthur kill." This is the ordinary language used for conferring authority. Had the state legislature passed a law in these terms, there could not be a doubt of its sufficiency to give authority. And there are expressions in the act which imply that plenary authority was intended to be given. The minute directions laid down as to the manner of construction and use of the bridge imply this. The third section declares "that any bridge *constructed under this act, and according to its limitations*, shall be a lawful structure," etc.; implying that the construction of the bridge, when built, would be under the act. If congress had no power to authorize the construction of the bridge, independent of state legislation, the act would, of course, be properly construed as permissory in its character, ancillary to, or confirmatory of, state legislation which might be adopted for the purpose of authorizing such a bridge. In other words, the act, within the scope of its terms, may have such effect given to it as comports with the power of the legislative body which enacted it; just as a deed of conveyance may operate as a grant, a bargain and sale, a release, or a confirmation, according to the interest of the grantor on the one hand, and of the grantee on the other. The true construction of the act, therefore, depends on the power of congress, which will be examined hereafter.

Another question of a preliminary character relates to the capacity and right of the defendant, the Staten Island Rapid Transit Railroad Company, to perform any acts and transact any business as a corporation in New Jersey. It is argued that corporations, as such, have no legal existence outside of the state by whose laws they are created, and cannot transact business in another state except by the comity of its laws, which are not accorded in the present case. This doctrine is subject to much qualification. The habits of business have so changed since the decision in the case of *Bank of Augusta* v. *Earle*, 13 Pet. 519, and corporate organizations have been found so convenient, especially as avoiding a dissolution at every change of membership, that a large part of the business of the country has come to be transacted by their instrumentality; while their most objectionable feature, the non-liability of corporators, has in most instances been abrogated in whole or in part; and to deny their admission from one state to another in ordinary cases, at the present day, would go far to neutralize that provision in the fourth article of the constitution which secures to the citizens of one state all the privileges and immunities of citizens in another, and that provision of the fourteenth amendment which secures to all persons the equal protection of the laws. So strongly is this felt that, in the recent case of *Santa Clara Co.* v. *Southern Pac. R. Co.*, 118 U. S. 394, 396, 6 Sup. Ct. Rep. 1132, the doctrine that corporations are not citizens or persons, within the protective language

of the constitution, was unanimously disapproved, and the court expressly held that they are entitled, as well as individuals, to the equal protection of the laws, under the fourteenth amendment of the constitution.

It is undoubtedly just and proper that foreign corporations should be subject to the legitimate police regulations of the state, and should have, if required, an agent in the state to accept service of process when sued for acts done or contracts made therein. In reference to some branches of business, like those of banking and insurance, which affect the people at large, they may also be subject to more stringent regulations for the security of the public, and may be even prohibited from pursuing them except upon such terms and conditions, not unlawful in themselves, as the state chooses to impose. But in the pursuit of business authorized by the government of the United States, and under its protection, the corporations of other states cannot be prohibited or obstructed by any state. If congress should employ a corporation of ship-builders to construct a man-of-war, they would have the right to purchase the necessary timber and iron in any state of the Union. And, in carrying on foreign and interstate commerce, corporations, equally with individuals, are within the protection of the commercial power of congress, and cannot be molested in another state by state burdens or impediments. This was held and decided in the case of *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 204, 5 Sup. Ct. Rep. 826, and affirmed in the recent case of *Philadelphia S. S. Co.* v. *Pennsylvania,* 122 U. S. 326, 7 Sup. Ct. Rep. 1118; and although the decision in *Paul* v. *Virginia,* 8 Wall. 168, conformed to the doctrine of *Augusta Bank* v. *Earle,* the following striking language was used by the court, to-wit:

"At the time of the formation of the constitution a large part of the commerce of the world was carried on by corporations. The East India Company, the Hudson's Bay Company, the Hamburgh Company, the Levant Company, and the Virginia Company may be named among the many corporations then in existence which acquired, from the extent of their operations, celebrity throughout the commercial world. This state of facts forbids the supposition that it was intended, in the grant of power to congress, to exclude from its control the commerce of corporations. The language of the grant makes no reference to the instrumentality by which commerce may be carried on; it is general, and includes alike commerce by individuals, partnerships, associations, and corporations."

We may fairly supplement this language by adding that, when the constitution was adopted, it could not have been supposed that the regulations of commerce to be made by congress might be of no avail to commercial corporations, or, at least, might be rendered nugatory with regard to them, in consequence of state restrictions upon their power to act as corporations in any other state than that of their origin.

At all events, if congress, in the execution of its powers, chooses to employ the intervention of a proper corporation, whether of the state, or out of the state, we see no reason why it should not do so. There is nothing in the constitution to prevent it from making contracts with or conferring powers upon, state corporations, for carrying out its own le-

gitimate purposes. What right of the state would be invaded? The corporation thus employed, or empowered, in executing the will of congress, could do nothing which the state could rightfully oppose or object to. It may be added that no state corporation more suitable than the defendant could be empowered to build the bridge in question in this case, since one-half of the bridge is in the state of New York, and the railroad of the defendant is to connect with it on the New York side.

In our judgment, if congress itself has the power to construct a bridge across a navigable stream for the furtherance of commerce among the states, it may authorize the same to be done by agents, whether individuals, or a corporation created by itself, or a state corporation already existing and concerned in the enterprise. The objection that congress cannot confer powers on a state corporation is untenable. It has used their agency for carrying on its own purposes from an early period. It adopted as post-roads the turnpikes belonging to the various turnpike corporations of the country, as far back as such corporations were known, and subjected them to burdens, and accorded to them privileges, arising out of that relation. It continued the same system with regard to canals and railroads, when these modes of transportation came into existence. Nearly half a century ago, it constituted every railroad built, or to be built, in the United States, a post-road. This, of course, involved duties, and conferred privileges and powers, not contained in their original charter. In 1866, congress authorized every steam-railroad company in the United States to carry passengers and goods on their way from one state to another, and to receive compensation therefor, and to connect with roads of other states, so as to form continuous lines for the transportation of the same to the place of destination. The powers thus conferred were independent of the powers conferred by the charter of any railroad company. Surely these acts of congress cannot be condemned as unconstitutional exertions of power.

In the present case the corporate capacity of the Staten Island Rapid Transit Railroad Company is admitted by making it a defendant. It is not excluded from the state by any want of comity in the laws of the state. Its alleged want of power under those laws to build the bridge in question, does not arise from anything peculiar to it as a foreign corporation, but from the general prohibition of the state law of April 6, 1886, which is applicable to all persons and corporations, and declares "that no bridge, viaduct, or fixed structure shall be created by any person or corporation over or in any part of the navigable waters separating this state from other states, where the tide ebbs and flows, without express permission of the legislature of this state, given by statutes for that purpose." This prohibition, in its broadest sense, inhibits the erection of such a bridge as is described therein, by congress itself, or (which is the same thing) by any person or corporation acting under the authority of congress, and, of course, is to that extent void, if congress has power to erect such a bridge. But if it is not to be taken in this broad sense, but as subject to the condition in law of being inoperative as against the paramount power of congress, then the authority of the defendant is unaffected by

it, inasmuch as the defendant has express power from congress to build the bridge. So that we are brought back to the question of the power of congress to build the bridge, and whether that power is independent of the consent and concurrence of the state government. And, in our judgment, this question must be answered in the affirmative.

The power to regulate commerce among the several states is given by the constitution in the most general and absolute terms. The "power to regulate," as applied to a government, has a most extensive application. With regard to commerce, it has been expressly held that it is not confined to commercial transactions, but extends to seamen, ships, navigation, and the appliances and facilities of commerce. And it must extend to these, or it cannot embrace the whole subject. Under this power, the navigation of rivers and harbors has been opened and improved, and we have no doubt that canals and water-ways may be opened to connect navigable bays, harbors, and rivers with each other, or with the interior of the country. Nor have we any doubt that, under the same power, the means of commercial communication by land as well as by water may be opened up by congress between different states, whenever it shall see fit to do so, either on failure of the states to provide such communication, or whenever, in the opinion of congress, increased facilities of communication ought to exist. Hitherto, it is true, the means of commercial communication have been supplied, either by nature in the navigable waters of the country, or by the states in the construction of roads, canals, and railroads, so that the functions of congress have not been largely called into exercise under this branch of its jurisdiction and power, except in the improvement of rivers and harbors, and the licensing of bridges across navigable streams. But this is no proof that its power does not extend to the whole subject in all its possible requirements. Indeed, it has been put forth in several notable instances, which stand as strong arguments of practical construction given to the constitution by the legislative department of the government. The Cumberland or National Road is one instance of a grand thoroughfare projected by congress, extending from the Potomac to the Mississippi. After being nearly completed, it was surrendered to the several states within which it was situate. The system of Pacific railroads presents several instances of railroads constructed through or into different states, as Iowa, Kansas, and California. The main stem of the Union Pacific commences at Council Bluffs, in Iowa, and crosses the Missouri by a bridge at that place erected under the authority of congress alone. In 1862, a bridge was authorized by congress to be constructed across the Ohio river at Steubenville, between the states of Virginia and Ohio, to be completed, maintained, and operated by the railroad company authorized to build it, and by another company named, "anything in any law or laws of the above-named states to the contrary notwithstanding." 12 St. 569.

Still, it is contended that, although congress may have power to construct roads and other means of communication between the states, yet this can only be done with the concurrence and consent of the states in

which the structures are made. If this is so, then the power of regulation in congress is not supreme; it depends on the will of the states. We do not concur in this view. We think that the power of congress is supreme over the whole subject, unimpeded and unembarrassed by state lines or state laws; that, in this matter, the country is one, and the work to be accomplished is national; and that state interests, state jealousies, and state prejudices do not require to be consulted. In matters of foreign and interstate commerce there are no states.

It is very true that in some cases of bridges authorized to be erected, and other things authorized to be done, congress may have required that the consent of the state should be first obtained. But the power of the United States cannot depend on the consent of the states; it is only to be found in the constitution. The consent of a state may sometimes facilitate the execution of a power, as the consent to the use of the prisons, court-houses, and other public buildings of the state; but it can never confer power. Particular states have sometimes consented to the employment of their courts and judicial machinery by the officers of the United States for condemning land for public purposes. But, if the United States had no power to take land by condemnation, such consent could not give it. So where, in any case, congress may have authorized the construction of a railroad or a bridge upon the condition of obtaining the consent of the state, it is clear that such consent was not required for the purpose of supplementing the power of congress to authorize the structure to be made, but rather for the purpose of manifesting a disposition of comity and good-will towards the state. For, if congress had not the power to authorize the structure, consent could not give it. All those cases, therefore, in which congress has given such authority, whether with or without the consent of the state, are precedents for affirming the power of congress. They are all instances of practical construction of the constitution in favor of it.

The most strenuous objection, however, to the exercise of the power in this case, and in the manner proposed, is based on the fact that the piers of the bridge are to rest, and the bridge is to stand, on land which belongs to the state, and that no compensation is proposed to be made for the taking thereof. It is contended that, if the land of the state can be taken at all, (which is denied,) it can, at most, only be taken, like other private property, after just compensation has been made.

*First*, it is denied that the land of the state can be taken at all without voluntary cession, or consent of the state legislature. If this is so, we are brought back to the dilemma of requiring the consent of the state in almost every case of an interstate line of communication by railroad, for hardly a case can arise in which some property belonging to a state will not be crossed. It will always be so at the passage of a navigable stream. This shows that the position cannot be sound, for it brings us to a *reductio ad absurdum*. It interposes an effectual barrier to the execution of a constitutional power vested in congress. It overlooks the fundamental principle that the constitution, and all laws made in pursuance thereof, are the supreme law of the land; for, if the consent of a

state is necessary, such state may always, in pursuit of its own interests, refuse its consent, and thus thwart the plain objects and purposes of the constitution.    One argument for the position is that no part of the territory of one sovereign can be acquired by another except by conquest or cession; and therefore, in a case like the present, where conquest is out of the question, it can only be acquired by cession; and this conclusion is supposed to be affirmed and provided for in our federal system by the seventeenth paragraph of section 8, art. 1, Const., which gives to congress power to exercise exclusive legislation "over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."    It is argued that this is the only constitutional method by which the United States government can obtain the possession and use of lands within a state, especially of lands belonging to the state.

The argument, however, is directed to the acquisition of territory, with exclusive jurisdiction over the same, and is entirely sound in that regard.    But it does not touch the question as to the power of the United States to acquire the mere use of land without exclusive jurisdiction therein.    Nearly all the powers of government are exercised over territory in which the United States and the several states have concurrent jurisdiction.    It is only in exceptional cases that the United States desires to have exclusive jurisdiction, and a consequent cession of territory. It is very true that the consent of the state legislature is required in order to give the United States this exclusive jurisdiction.    But that is all. It is not required when exclusive jurisdiction is not sought.    On the contrary, the government, if it sees fit, may condemn land for its purposes without the consent of the state.    Thus it was decided by the supreme court in the case of *Kohl* v. *U. S.*, 91 U. S. 367, that the government of the United States may exercise the right of eminent domain within a state, for the purpose of condemning land for the use of a post-office building, and may, for this purpose, resort to its own courts.    In such a case, there cannot be a doubt that the post-office building could be erected and used by the government without asking the consent of the state legislature.    Such consent would, indeed, be necessary to vest in the United States exclusive jurisdiction over the post-office building and grounds; but it would not be necessary to enable the government to use the property for the purposes for which it was acquired.    And so of any other property wanted for a public purpose; the consent of the legislature is not necessary to its acquisition, or to its use; but only to the exclusion of state jurisdiction over the place.    That jurisdiction, if allowed to remain, will extend to the punishment of crimes committed against state laws therein, and to the service of state process, but, of course, cannot interfere with the execution of the United States laws, nor with the performance, by United States officers and agents, of the duties devolved upon them.

In short, cession by a state is only necessary to extinguish its jurisdiction, in whole or in part, and is not necessary to the use of land by the United States for public purposes,—subject, like all lands within

the limits of the Union, to the concurrent jurisdiction of both governments; that of the United States being supreme. The laws of the latter are supreme everywhere, in the states as well as in the territories of the United States; but have exclusive force, within the states, only in such places as have been ceded by them.

The argument based upon the doctrine that the states have the eminent domain or highest dominion in the lands comprised within their limits, and that the United States have no dominion in such lands, cannot avail to frustrate the supremacy given by the constitution to the government of the United States in all matters within the scope of its sovereignty. This is not a matter of words, but of things. If it is necessary that the United States government should have an eminent domain still higher than that of the state, in order that it may fully carry out the objects and purposes of the constitution, then it has it. Whatever may be the necessities or conclusions of theoretical law as to eminent domain or anything else, it must be received as a postulate of the constitution that the government of the United States is invested with full and complete power to execute and carry out its purposes. And as one of these purposes is the regulation of commerce among the several states, and as that involves the needs and ways of intercommunication, it follows that congress may provide for these necessities whether the states co-operate and concur therein or not.

But, *secondly*, it is contended that if the United States can constitutionally take the land of the state, as well as that of the citizen, for public purposes, without consent, it can only do so in the same manner, and subject to the same conditions, namely, that of making just compensation. It is urged that the language of the fifth amendment of the constitution is applicable to the case, and is imperative. This language is "nor shall private property be taken for public use without just compensation." It is insisted that the property of the state in lands under its navigable waters is private property, and comes strictly within the constitutional provision. It is significantly asked, can the United States take the state-house at Trenton, and the surrounding grounds belonging to the state, and appropriate them to the purposes of a railroad depot, or to any other use of the general government, without compensation? We do not apprehend that the decision of the present case involves or requires a serious answer to this question. The cases are clearly not parallel. The character of the title or ownership by which the state holds the state-house is quite different from that by which it holds the land under the navigable waters in and around its territory.

The information rightly states that, prior to the Revolution, the shore and lands under water of the navigable streams and waters of the province of New Jersey belonged to the king of Great Britain as part of the *jura regalia* of the crown, and devolved to the state by right of conquest. The information does not state, however, what is equally true, that, after the conquest, the said lands were held by the state, as they were by the king, *in trust* for the public uses of navigation and fishery, and the erection thereon of wharves, piers, light-houses, beacons, and other facil-

ities of navigation and commerce. Being subject to this trust, they were *publici juris;* in other words, they were held for the use of the people at large. It is true that to utilize the fisheries, especially those of shell-fish, it was necessary to parcel them out to particular operators, and employ the rent or consideration for the benefit of the whole people; but this did not alter the character of the title. The land remained subject to all other public uses as before, especially to those of navigation and commerce, which are always paramount to those of public fisheries. It is also true that portions of the submerged shoals and flats, which really interfered with navigation, and could better subserve the purposes of commerce by being filled up and reclaimed, were disposed of to individuals for that purpose. But neither did these dispositions of useless parts affect the character of the title to the remainder.

Such being the character of the state's ownership of the land under water,—an ownership held, not for the purpose of emolument, but for public use, especially the public use of navigation and commerce,—the question arises whether it is a kind of property susceptible of pecuniary compensation, within the meaning of the constitution. The fifth amendment provides only that *private property* shall not be taken without compensation; making no reference to public property. But, if the phrase may have an application broad enough to include all property and ownership, the question would still arise whether the appropriation of a few square feet of the river bottom to the foundation of a bridge which is to be used for the transportation of an extensive commerce in aid and relief of that afforded by the water-way, is at all a diversion of the property from its original public use. It is not so considered when sea-walls, piers, wing-dams, and other structures are erected for the purpose of aiding commerce by improving and preserving the navigation. Why should it be deemed such when (without injury to the navigation) erections are made for the purpose of aiding and enlarging commerce beyond the capacity of the navigable stream itself, and of all the navigable waters of the country? It is commerce, and not navigation, which is the great object of constitutional care.

The power to regulate commerce is the basis of the power to regulate navigation, and navigable waters and streams, and these are so completely subject to the control of congress, as subsidiary to commerce, that it has become usual to call the entire navigable waters of the country the navigable waters of the United States. It matters little whether the United States had or has not the theoretical ownership and dominion in the waters, or the land under them; it has, what is more, the regulation and control of them for the purposes of commerce. So wide and extensive is the operation of this power that no state can place any obstruction in or upon any navigable waters against the will of congress, and congress may summarily remove such obstructions at its pleasure. And all this power is derived from the power "to regulate commerce." Is this power stayed when it comes to the question of erecting a bridge for the purposes of commerce across a navigable stream? We think not. We think that the power to regulate commerce between the states extends, not only

to the control of the navigable waters of the country, and the lands under them, for the purposes of navigation, but for the purpose of erecting piers, bridges, and all other instrumentalities of commerce which, in the judgment of congress, may be necessary or expedient.

Entertaining these views with regard to the power of congress over the whole subject of the regulation of commerce among the several states, including that of the navigable waters of the country, and the lands under the same, as subsidiary to that end, we have no hesitation in declaring our opinion to be that the authority given by the act of June 16, 1886, to build the bridge in question, and, for that purpose, to erect the necessary piers of such bridge upon the lands under water of Arthur kill, is valid and constitutional, and does not injuriously affect any property or other rights of the state of New Jersey. This conclusion resolves also the other questions remaining unanswered, with regard to the true construction of the act, and the capacity of the defendant the Staten Island Rapid Transit Railroad Company to perform the acts necessary to execute the authority given by congress.

The information is dismissed, with costs, and the injunction heretofore granted is dissolved.