## UNITED STATES v. 4,450.72 ACRES OF LAND, CLEARWATER COUNTY, STATE OF MINNESOTA et al.

### No. 932.

District Court, D. Minnesota, Sixth Division.
March 7, 1939.

168

Victor E. Anderson, U. S. Atty., of St. Paul, Minn., and C. U. Landrum, Sp. Asst. U. S. Atty., and D. N. Lindeman, Sp. Atty., both of Detroit Lakes, Minn., for the United States.

William S. Ervin, Atty. Gen. of Minnesota, Frank H. Osterlind, Asst. Atty. Gen., and Armond D. Brattland and George

Cahill, Sp. Asst. Attys. Gen., for respondents.

NORDBYE, District Judge.

On the 23rd day of June, 1926, Congress enacted certain legislation whereby there was created a reserve to be known as the Wild Rice Lake Reserve, for the exclusive use and benefit of the Chippewa Indians of Minnesota. This Act reads (44 Stat. 763):

"An Act Setting aside Rice Lake and contiguous lands in Minnesota for the exclusive use and benefit of the Chippewa Indians of Minnesota.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

"That there be, and is hereby, created within the limits of the White Earth Indian Reservation in the State of Minnesota a reserve to be known as Wild Rice Lake Reserve, for the exclusive use and benefit of the Chippewa Indians of Minnesota, which reserve shall include Rice Lake and the following described contiguous lands, to wit: Beginning at the northwest corner of the northeast quarter of the southeast quarter of section 8 in township 145 north, range 38 west, and running due east to the northeast corner of southeast quarter of section 9; thence south to northeast corner of northeast quarter of section 16; thence due east to northeast corner of northeast quarter of section 14, township 145 north, range 38 west; thence due south to southeast corner of northeast quarter of section 2, township 144 north, range 38 west; thence due west to southwest corner of northwest quarter of section 3 of said township and range; thence due north to southwest corner of northwest quarter of section 15, township 145 north, range 38 west; thence due west to southwest corner of northwest quarter of section 16; thence due north to northwest corner of northwest quarter of said section 16; thence west to southwest corner of southeast quarter of southeast quarter of section 8; thence north to point of beginning, which, excluding the lake bed, contains approximately four thousand five hundred acres.

"Sec. 2. All unallotted and undisposed of lands within the area described in section 1 hereof are hereby permanently withdrawn from sale or other disposition and are made a part of said reserve, and the Secretary of the Interior is authorized to acquire by purchase any lands within said area now owned by the State of Minnesota or in private ownership at a price not to exceed $5 per acre, and to acquire from private owners by condemnation proceedings, in accordance with the laws of the State of Minnesota relating to the condemnation of private property for public use, any lands within said area which can not be purchased at the price herein named; the purchase price and costs of acquiring said lands to be paid out of the trust fund standing to the credit of all the Chippewa Indians of Minnesota in the Treasury of the United States upon warrants drawn by the Secretary of the Interior.

"Sec. 3. The reserve hereby created shall be maintained for the exclusive use and benefit of the Chippewa Indians of Minnesota under the supervision of the Secretary of the Interior and under rules and regulations to be prescribed by the said Secretary.

"Approved, June 23, 1926."

The only unallotted lands consist of small tracts held by the Government in trust for certain full-blooded and mixed-blood Indians. No lands were purchased by the Government in pursuance of this Act. Attempts have been made from time to time to procure swamp lands from the State, but all efforts were apparently unsuccessful. However, on July 30, 1934, a petition in condemnation was filed in behalf of the petitioner, but at that time proceedings had already been instituted in behalf of the State to acquire a part of the lands described in the so-called Wild Rice Lake Reserve.

The State had for some time interested itself in lower Wild Rice Lake as a reserve for a public hunting ground and game refuge. Although it had refused to sell the lands owned by it to the Government, it had manifested an intention and desire to cooperate with the Government in preserving the rights of the Chippewa Indians in and to the wild rice growing in this lake. It appears that there grows in Wild Rice Lake one of the finest beds of wild rice in the entire state, and the Indians from time immemorial have looked to the wild rice growing in this lake as one of their chief sources of food. In furtherance of the policy of cooperation, the Legislature of the State in the year 1929 passed an act granting to the Chippewa Indians exclusive right to collect the

wild rice growing in this lake, and since that time, with the cooperation of the Conservation Department of the State, camp sites have been maintained for the Indians, sanitary conditions have been improved, and dams have been constructed so that the water levels of the lake might be kept uniform and thus aid the production of wild rice.

The State has enacted the following legislation (Chap. 120, Laws of 1929, Sections 6131-1, 2 and 3, Mason's Minn.Stat. 1938 Supp.):

"The exclusive right of collecting wild rice on lower Rice Lake in Clearwater County is hereby granted the Chippewa Band of Indians residing in the State of Minnesota, and the Indians and all other persons are hereby prohibited from the shooting of migratory birds on said lake during each season until the Indians have completed their rice collecting operations; provided, that such date of completion of rice collecting operation shall be determined by the Commissioner of Game and Fish and a Council appointed by the Band of Chippewa Indians so engaged in collecting of the rice upon said lake.

"The existing water level in said lake shall not be changed by any public or private agency so as to interfere with the growth or harvesting of wild rice in said lake.

"The provisions of this act shall be severable, and if any provision shall be held invalid it shall not affect any other provision hereof."

In May, 1934, the State instituted its proceedings in condemnation, and on December 31, 1934, after a hearing in State Court, at which the Government was represented and presented objections to the granting of the State's petition, the State District Court made its order appropriating the area described in the State's petition for a public hunting ground and game reserve, and specifically and exclusively reserved to the Chippewa Indians the right to harvest wild rice in the area. The State proceedings embraced the lands described in the 1926 Act of Congress and additional lands contiguous thereto.

The Government's first petition was not presented to this Court until January 2, 1935, which was after the order of appropriation by the State District Court. On February 23, 1935, this Court denied without prejudice the Government's petition for condemnation. It was the Court's opinion that the Act of 1926 and the prior general legislation of August 1, 1888 (25 Stat. 357, 40 U.S.C.A. § 257) did not specifically authorize the Government to condemn state-owned lands, and in view of the allowance of the State's petition for condemnation after the Act of 1926, and the apparent conflict between the two sovereigns which had developed, this Court concluded that, in view of these new circumstances, Congress should specifically express its intention to condemn state-owned lands, and to that end should enact further legislation as to the necessity and desirability of further proceedings. This Congress did in Public Resolution No. 217, which was approved on July 24, 1935, and which is entitled, "To amend an Act entitled 'An Act setting aside Rice Lake and contiguous lands in Minnesota for the exclusive use and benefit of the Chippewa Indians of Minnesota', approved June 23, 1926, and for other purposes." This resolution reads (49 Stat. 496):

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Act entitled 'An Act setting aside Rice Lake and contiguous lands in Minnesota for the exclusive use and benefit of the Chippewa Indians of Minnesota', approved June 23, 1926 (44 Stat.L. 763), be, and the same is hereby, amended to read as follows:

"'That there be, and is hereby, created within the county of Clearwater, State of Minnesota, a permanent reserve to be known as 'Wild Rice Lake Indian Reserve', which reserve shall include Rice Lake and the following-described contiguous lands: Beginning at the northwest corner of the northeast quarter southeast quarter section 8, township 145 north, range 38 west, and running due east to the northeast corner of southeast quarter section 9; thence south to northeast corner of northeast quarter section 16; thence due east to northeast corner of northeast quarter section 14, township 145 north, range 38 west; thence due south to southeast corner of northeast quarter section 2, township 144 north, range 38 west; thence due west to southwest corner of northwest quarter section 3 of said township and range; thence due north to southwest corner of northwest quarter section 15, township 145 north, range 38 west; thence due west to southwest corner of northwest quarter section 16; thence due

north to northwest corner of northwest quarter said section 16; thence west to southwest corner of southeast quarter southeast quarter section 8; thence north to point of beginning, which, excluding the lake bed, contains approximately four thousand five hundred acres.

" 'Sec. 2. All unallotted and undisposed-of public or Indian lands held in trust by the United States within the area described in section 1 hereof are hereby permanently withdrawn from sale or other disposition and are made a part of said reserve; and the Secretary of the Interior is authorized to (a) accept in the name of the United States voluntary conditional grants, conditioned only upon the continued permanent use of said lands for the purpose hereinafter stated, and none other, of any lands within said reserved area now held in public, private, State, or Indian ownership; (b) acquire by purchase any of said lands not so conditionally granted at such price as he may deem fair and equitable; or (c) acquire by condemnation any of said lands not acquired by conditional grants or by purchase, so as to vest in the United States for the purposes of this Act good title to all land included in any such reserve.

" 'Sec. 3. The Secretary of the Interior is authorized, in his discretion, to establish not to exceed three additional wild-rice reserves in the State of Minnesota, which shall include wild-rice-bearing lakes situated convenient to Chippewa Indian communities or settlements, including all lands which, in the judgment of said Secretary, are necessary to the proper establishment and maintenance of said reserves and the control of the water levels of the lakes: Provided, however, That there shall be and hereby is excluded from said reserves any and all areas, whether of land or water, necessary or useful for the development to the maximum of water power or the improvement of navigation in the Pigeon River, an international boundary stream, and tributary lakes and streams. The Secretary is authorized to withdraw and acquire, on the same terms provided in section 2 hereof, all lands which, in his judgment, may be necessary for the proper establishment, control, maintenance, and operation of any reserve established under this section.

" 'Sec. 4. Any reserves established under this Act, including the water levels therein, shall be maintained and operated under the supervision and control of the Secretary of the Interior, in conformity with such rules and regulations as he may prescribe, for the primary purpose of conserving wild rice beds for the exclusive use and benefit of the Chippewa Indians of Minnesota. The said Secretary, upon such terms and conditions as he may deem proper, may enter into an agreement in writing with the State of Minnesota, through its department of conservation, or other proper State agency, for the administration of any reserve created under this Act, and for its use for other or different purposes, conditioned only that such other and different uses shall not impair the primary purpose for which said reserve was created and its administration in strict conformity with said rules and regulations prescribed by said Secretary.

" 'Sec. 5. All costs of establishing the reserves herein authorized, including the acquisition of the lands, and the construction of dams or other structures to regulate the water levels, are hereby authorized to be paid by the Secretary of the Interior out of the trust funds of the Chippewa Indians of Minnesota in the Treasury of the United States.

"Approved July 24, 1935."

In view of the prior legislation and history of these proceedings, it is clear that this Act intended expressly to authorize the condemnation of state-owned lands. Pursuant to the legislation, the Secretary of the Interior requested the Attorney General to bring this action. In the meantime, the State had gone ahead with its plans to utilize the area included in its petition as a public hunting ground and game refuge. The testimony taken before this Court on the objections of the State and the other respondents is largely directed to the nature of the public use by the State and a contention of the State that the Government would have to prove that its public use was higher and superior.

It is apparent from the testimony that the State has proceeded in good faith to acquire the area embraced in its condemnation proceedings and other contiguous land including Wild Rice Lake, and its project includes an area which is larger than the present project of the Government. The testimony indicates that the State has condemned certain lands, some of which it owns as swamp lands, and some which have reverted to the State because of failure to pay taxes. The evi-

dence indicates that there may be a question as to some of the titles that the State holds, and it is uncontradicted that it does not have title to all of the land in the Government's proposed refuge. On the other hand, there are certain areas which are now owned by the State and its title is apparently good, and if the Government's petition is to be allowed, it necessarily involves condemnation of certain lands owned by the State, which the State has devoted, or intends to devote, to a public use. Any improvement that the State has made in this area has largely been directed to improving conditions in so far as the Indians are concerned. It has erected camps and made roads, all of which tends to benefit the Indians who gather in this area at certain times of the year to gather wild rice. It may be observed that much of the improvement and the expenditures made by the State have been made possible by the use of Federal funds, which have been furnished to the State. So far as the public hunting ground and wild game refuge is concerned, the area is about the same as it has been for centuries. This area has always been available to hunters. Wild fowl have rested and nested on this lake during their migrations and large numbers of birds have made their homes there during the summer season.

We have, therefore, a controversy between the State and the Federal government regarding the supervision of this area. The Federal government is of the opinion that it is indispensable that this area be reserved exclusively for the Indians under the supervision of the National government, and the State is of the opinion that it should utilize this area for a public hunting ground and game refuge with due protection for the rights of the Indians.

While the answer and objections on the part of the State and the other respondents were limited to the issues as to whether or not the Government's proposed project constituted a superior and paramount public use, the briefs filed by the respondents have set forth the following reasons why the Government's petition should not be granted:

"First. The State contends that the Acts of Congress of June 23, 1926 (44 Stat. 763), and the Act of July 24, 1935 (49 Stat. 496), are invalid because the proposed exercise of the right of eminent domain as applied to these proceedings is not in furtherance of any powers delegated to the government under the Constitution.

"Second. That the said acts are invalid because the proposed exercise of the right of eminent domain for the taking of the lands in these proceedings for an Indian Reservation is not a public use.

"Third. That the taking does not constitute a taking for a superior or paramount use.

"Fourth. That the taking violates the rights of sovereignty existing in the State resulting from the implied immunity which exists in its favor to exercise its governmental functions without the undue interference of the other.

"Fifth. That the present proceeding is not within the jurisdiction conferred upon this court by the Constitution of the United States or any legislation enacted pursuant thereto."

The right of eminent domain is an attribute of sovereignty. It flows from sovereignty. "The right is the offspring of political necessity; and it is inseparable from sovereignty, unless denied to it by its fundamental law," Kohl et al. v. United States, 91 U.S. 367, 371, 372, 23 L. Ed. 449. But it necessarily follows that the United States can only exercise this right in the States in the exercise or in furtherance of the powers conferred upon it by the Constitution. The government of the United States is one of delegated powers. The Constitution must be searched in order to determine whether or not the acts of Congress, upon which these proceedings are based, find support in a constitutional power, expressed or necessarily implied from one or more of the express powers. The question directly presented, therefore, is whether the United States can condemn lands in a State for the purpose of establishing an Indian reservation or reserve. The question may perhaps be put in another way, which encompasses both the first and second points urged by the respondents, Is the use to which the Government intends to put the area the kind of public use for which the Federal government is authorized to condemn lands?

The only constitutional power which refers to Indians is Article 1, Section 8, Clause 3, U.S.C.A.Const., which authorizes Congress "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Com-

merce with Indian tribes passes state lines. The power to regulate it grants Congress power wherever the subject exists. United States v. Holliday, 70 U.S. 407, 3 Wall. 407, 18 L.Ed. 182. Under the constitutional provisions, Congress has dealt with the Indians as a dependent people, solely and exclusively in its charge. United States v. Sandoval, 231 U.S. 28, 45, 34 S.Ct. 1, 58 L.Ed. 107.

In Cherokee Nation v. State of Georgia, 30 U.S. 1, 5 Pet. 1, 8 L.Ed. 25, Chief Justice Marshall in referring to the Indians and their relationship to the United States, said (page 17): "They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian. They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the president as their great father."

This language is referred to in United States v. Kagama, 118 U.S. 375, 382, 6 S. Ct. 1109, 1113, 30 L.Ed. 228, as follows:

"Perhaps the best statement of their position is found in the two opinions of this court by Chief Justice Marshall in the case of the Cherokee Nation v. Georgia, 5 Pet. 1 [8 L.Ed. 25], and in the case of Worcester v. State of Georgia, 6 Pet. [515] 536. [8 L.Ed. 483]." * * *

"In the opinions in these cases, they are spoken of as 'wards of the nation;' 'pupils;' as local dependent communities. In this spirit the United States has conducted its relations to them from its organization to this time."

The court then continues (118 U.S. pages 383, 384, 6 S.Ct. page 1114, 30 L. Ed. 228):

"These Indian tribes are the wards of the nation. They are communities dependent on the United States,—dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen.

"In the case of Worcester v. State of Georgia [above cited], it was held that, though the Indians had by treaty sold their land within that state, and agreed to remove away, which they had failed to do, the state could not, while they remained on those lands, extend its laws, criminal and civil, over the tribes; that the duty and power to compel their removal was in the United States, and the tribe was under their protection, and could not be subjected to the laws of the state, and the process of its courts. * * *

"The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied; and because it alone can enforce its laws on all the tribes."

■ It will be seen from the excerpts referred to above that the power to regulate commerce with the Indian tribes has, throughout the years, by legislative and judicial recognition, embraced all necessary power and authority to carry out a broad concept of the constitutional grant. In order to regulate commerce completely with the Indians, it was presumably deemed necessary for the Government to assume with them the relationship of guardian and ward. In considering the interpretation of the term "commerce" as used in the Constitution, where it is provided that Congress shall have authority to carry on commerce with the Indian tribes, it would seem that the commerce contemplated by the framers of the Constitution was the trading by the white man with the various individuals of the Indian tribes. That commerce is necessarily intrastate and is carried on within the States. In establishing schools and churches, supervising the education of the Indians and prohibiting the sale of intoxicants, etc., the Government must have assumed that such supervision would increase and strengthen the commerce with the Indians. The only

constitutional authority for the guardianship relation which now exists is to be found in the so-called commerce clause. If the establishment of such a relationship is within the purview of the constitutional provision, it would seem that the attempt of the Government to acquire a reserve for the Indians so that they can have access to a huge wild rice bed is likewise within the scope of the constitutional power. Congress must have assumed that the procuring of this wild rice bed would aid and assist the Indians in obtaining that which to them is a very important source of livelihood. If this is true, the efforts of the Government may prevent this tribe from becoming an indigent and pauperized group, and any enhancement or improvement in their economic situation unquestionably will have an effect upon, and bear a direct relationship to, the commerce which is carried on with the Indian tribes. It may be observed in passing that wild rice is a commodity that Indians not only use for their food, but sell to the white man and others. It is, in and of itself, an article of commerce. When it is recognized that the Indians are properly the wards of the National Government in pursuance of the commerce clause, it necessarily follows that the government is clothed with broad authority in fulfilling such duties. That Congress has since the very inception of this government assumed such power is graphically portrayed by the erection of schools, churches, hospitals, the establishment of agencies and reserves, etc., so that the economic conditions of the Indians may be improved. The Government determines when the Indian must go to school, supervises his farming operations, aids him in meeting the various problems which have arisen due to the inevitable advance of the white man in the territory which the Indian has had exclusively for himself. If, therefore, the sovereign determines that as guardian it becomes necessary to acquire certain lands that are peculiarly valuable to the Indians, it would seem that there is no reasonable doubt as to the authority of Congress to proceed by appropriate steps to obtain such lands. Congress has determined that it is necessary to obtain this area in order to safeguard the rights of the wards of the Government. The right of the United States to condemn land is recognized when it is necessary and proper to do so in carrying out its federal powers. If the premise is

sound that the obtaining of the land as a reserve for Indians is in the exercise of lawful federal power, the right of eminent domain exists, and the lands are devoted to a public use. In other words, it is a public use if the project comes within the purview of federal power. United States v. Gettysburg Electric R. Co., 160 U.S. 668, 16 S.Ct. 427, 40 L.Ed. 576.

█ In passing the Act of 1926, Congress gave notice that it created, and intended to create by the acquisition of additional lands, a reserve known as the Wild Rice Lake Reserve for the exclusive use and benefit of the Chippewa Indians of Minnesota. The reserve included Wild Rice Lake and certain contiguous lands. Notwithstanding this action of Congress, the State of Minnesota proceeded with its legislation, and ultimately proceeded to condemn certain land in this area by filing a petition about a month before the Government initiated its original proceeding. In passing the amended legislation of 1935, the Government evidently concluded that, notwithstanding the activities of the State and its professed desire to aid and cooperate with the Federal government in looking after the Indians, its tutelage of the Chippewas requires its exclusive supervision over this area. Its supremacy over the State in looking after the Indian tribes is conceded. In its activities and in furtherance of a Federal power, the United States is supreme and the State must give way.

█ That the United States may condemn state-owned lands is conceded. However, the State strenuously urges that it is now devoting some of the land in this area to a public use, and that it is engaged in consummating a program which will embrace substantially all of the land in the Government's area for a State public use, and therefore the Federal government cannot proceed by eminent domain as against state-owned property. It urges that the Government must establish that its proposed public use is higher and superior to the public use which the State is exercising. The public use of the State is the setting aside of this area as a public hunting ground and game refuge. The proposed public use of the Government is the establishment of a reserve in this area for the exclusive use of its wards, the Chippewa Indians. Whether the test of a superior public use is determinative of this question,

is not entirely clear from the decisions, though there are a few cases that have indicated that such a test should be applied when there is a conflict between two sovereigns. In re Certain Land in Lawrence, D.C., 119 F. 453; United States v. Certain Land in Town of New Castle, C.C., 165 F. 783; United States v. City of Tiffin et al., C.C., 190 F. 279. It would seem that there should be some limit to the powers of the United States in condemning property of a State which is already devoted to a public use. If it were otherwise, the Federal government could arbitrarily imperil the very functions of the State itself, but this Court is not prepared to hold that the proposed establishment of an Indian reserve in this area in any way imperils or threatens any superior use to which the State is now devoting the property. A comparison of the various types of public use to which property may be devoted is difficult. If there is any doubt in the matter, such doubt should be resolved in favor of the Federal government, because, as was stated by Justice Holmes in Sanitary District v. United States, 266 U.S. 405, 425, 45 S.Ct. 176, 178, 69 L.Ed. 352: "This is not a controversy between equals. The United States is asserting its sovereign power to regulate commerce and to control the navigable waters within its jurisdiction."

And 266 U.S. at page 426, 45 S.Ct. at page 178, 69 L.Ed. 352: "The main ground is the authority of the United States to remove obstructions to interstate and foreign commerce. There is no question that this power is superior to that of the States to provide for the welfare or necessities of their inhabitants. In matters where the States may act the action of Congress overrides what they have done. Monongahela Bridge Co. v. United States, 216 U.S. 177, 30 S.Ct. 356, 54 L.Ed. 435; Second Employers' Liability Cases, 223 U.S. 1, 53, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A.,N.S., 44."

In Stockton v. Baltimore & N. Y. R. Co., C.C., 32 F. 9, the court stated (pages 18, 19): "In short, cession by a state is only necessary to extinguish its jurisdiction, in whole or in part, and is not necessary to the use of land by the United States for public purposes,—subject, like all lands within the limits of the Union, to the concurrent jurisdiction of both governments; that of the United States being supreme. The laws of the latter are supreme everywhere, in the states as well as in the territories of the United States; but have exclusive force, within the states, only in such places as have been ceded by them."

This area is located in a large, sparsely settled region in the Northern part of our State. Whether the Government or the State has control, wild game will propagate and flourish. It is not contended that the existence of an Indian reserve will particularly interfere with the normal use of this area by wild fowl. Hunting rights may be restricted, but the evidence does not indicate that the rights of the people of this State would be materially affected thereby. The Northern part of our State abounds with hunting lakes. Both sovereigns protest their superior ability to conserve this area for the Chippewa Indians. All improvements that have been made by the State are directed to that end. In fact, it would appear that the primary public use contemplated by both sovereigns is substantially the same, although the State does envisage a public hunting ground. Considering the entire factual situation disclosed by the evidence, it is the Court's opinion that an Indian reserve in this area, which will permanently conserve the wild rice for the Indians, is superior and paramount to the present public use by the State. If the public use of both sovereigns is mainly directed to the aid and assistance of the Indians, the Federal government has the exclusive duty to look after its wards, and in carrying out this Federal power, it cannot be restricted by the State.

The question of necessity rests exclusively with Congress, and Congress having acted by express legislation with full knowledge of the State proceedings and activities in this area, the Court's power is limited in absence of fraud or clear abuse of discretion to the determination of whether or not the proposed taking constitutes a public use. Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170; Old Dominion Land Co. v. United States, 269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162. Nor is it necessary to obtain the consent of the State before the Federal government can condemn state-owned property. Kohl v. United States, supra; Stockton v. Baltimore & N. Y. R. Co., supra. In the latter case, the court stated (page 19 of 32 F.): "The argument based upon the doctrine that the states have the em-

inent domain or highest dominion in the lands comprised within their limits, and that the United States have no dominion in such lands, cannot avail to frustrate the supremacy given by the constitution to the government of the United States in all matters within the scope of its sovereignty. This is not a matter of words, but of things. If it is necessary that the United States government should have an eminent domain still higher than that of the state, in order that it may fully carry out the objects and purposes of the constitution, then it has it. Whatever may be the necessities or conclusions of theoretical law as to eminent domain or anything else, it must be received as a postulate of the constitution that the government of the United States is invested with full and complete power to execute and carry out its purposes. And as one of these purposes is the regulation of commerce among the several states, and as that involves the needs and ways of intercommunication, it follows that congress may provide for these necessities whether the states co-operate and concur therein or not."

The State urges that the Court lacks jurisdiction, because in actions to which the State is a party as a sovereign, jurisdiction rests in the Supreme Court by the provisions of Section 2, Article 3, of the Constitution of the United States, U. S.C.A., and that exclusive jurisdiction is conferred in such cases on the Supreme Court by the Judiciary Act of 1789, Section 341, Title 28 U.S.C.A. However, it is well settled that the original jurisdiction conferred on the Supreme Court is not exclusive, if Congress has by other legislation indicated intention to confer jurisdiction on other courts. Ames v. Kansas, 111 U.S. 449, 4 S.Ct. 437, 28 L.Ed. 482. Congress did enact legislation on August 1, 1888 (25 Stat. 357, 40 U.S.C.A. § 257) granting to the Secretary of the Treasury, or any other officer of the Government, authority to procure real estate, etc., for public use for the United States by condemnation, and conferred jurisdiction on the United States District Courts of proceedings for such purposes. It is quite clear that, by reason of this legislation, Congress intended to confer jurisdiction on the District Courts to hear and determine all condemnation proceedings regardless of whether or not the State is a party. The convenience of witnesses, the location of the land, the adoption of State eminent domain procedure in such actions, all bear upon such intention and confirm the position of the petitioner in this case that this Court has jurisdiction. This view is supported in United States v. Forty Acres, More or Less, of Land, etc., D.C., 24 F. Supp. 390; United States v. Ladley, D.C., 51 F.2d 756; United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567.

It follows, therefore, that the petition of the Government must be granted, and an appropriate order may be submitted to the Court by the Special Assistant United States Attorney.