(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PENNEAST PIPELINE CO., LLC *v.* NEW JERSEY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 19–1039. Argued April 28, 2021—Decided June 29, 2021

Congress passed the Natural Gas Act in 1938 to regulate the transportation and sale of natural gas in interstate commerce. To build an interstate pipeline, a natural gas company must obtain from the Federal Energy Regulatory Commission a certificate reflecting that such construction "is or will be required by the present or future public convenience and necessity." 15 U. S. C. §717f(e). As originally enacted, the NGA did not provide a mechanism for certificate holders to secure property rights necessary to build pipelines, often leaving certificate holders with only an illusory right to build. Congress remedied this defect in 1947 by amending the NGA to authorize certificate holders to exercise the federal eminent domain power, thereby ensuring that certificates of public convenience and necessity could be given effect. See §717f(h).

FERC granted petitioner PennEast Pipeline Co. a certificate of public convenience and necessity authorizing construction of a 116-mile pipeline from Pennsylvania to New Jersey. Several parties, including respondent New Jersey, petitioned for review of FERC's order in the D. C. Circuit. The D. C. Circuit has held those proceedings in abeyance pending resolution of this case. PennEast filed various complaints in Federal District Court in New Jersey seeking to exercise the federal eminent domain power under §717f(h) to obtain rights-of-way along the pipeline route approved by FERC. As relevant here, PennEast sought to condemn parcels of land in which either New Jersey or the New Jersey Conservation Foundation asserts a property interest. New Jersey moved to dismiss PennEast's complaints on sovereign immunity grounds. The District Court denied the motion, and it granted PennEast's requests for a condemnation order and preliminary injunctive relief. The Third Circuit vacated the District Court's order insofar

as it awarded PennEast relief with respect to New Jersey's property interests. The Third Circuit concluded that because §717f(h) did not clearly delegate to certificate holders the Federal Government's ability to sue nonconsenting States, PennEast was not authorized to condemn New Jersey's property.

*Held*: Section 717f(h) authorizes FERC certificate holders to condemn all necessary rights-of-way, whether owned by private parties or States. Pp. 6–23.

(a) The United States raises a threshold challenge to the Third Circuit's jurisdiction below on the grounds that §717r(b) grants the court of appeals reviewing FERC's certificate order (here, the D. C. Circuit) "exclusive" jurisdiction to "affirm, modify, or set aside such order." The Court rejects this challenge. New Jersey does not seek to modify FERC's order; it asserts a defense against the condemnation proceedings initiated by PennEast. The Third Circuit's decision that §717f(h) does not grant natural gas companies the right to bring condemnation suits against States did not "modify" or "set aside" FERC's order, which neither purports to grant PennEast the right to file a condemnation suit against States nor addresses whether §717f(h) grants that right. Contrary to the argument of the United States, New Jersey's appeal is not a collateral attack on the FERC order. Pp. 6–7.

(b) The Federal Government has exercised its eminent domain authority since the founding, connecting our country through turnpikes, bridges, and railroads—and more recently through pipelines, telecommunications infrastructure, and electric transmission facilities. The Court has upheld these exercises of the federal eminent domain power—whether by the Government or a private corporation, whether through the upfront taking of property or a condemnation action, and whether against private property or state-owned land. Section 717f(h) falls within this established practice. Pp. 7–12.

(1) Governments have long taken property for public use without the owner's consent. The United States is no different. While the Constitution and Bill of Rights did not use the term "eminent domain," the Takings Clause of the Fifth Amendment ("nor shall private property be taken for public use, without just compensation") presupposed the existence of such a power. Initially, the Federal Government exercised its eminent domain authority in areas subject to exclusive federal jurisdiction. The Court later confirmed that federal eminent domain extended to property within a State. *Kohl* v. *United States*, 91 U. S. 367. The Court's decision in *Kohl*—which upheld the power of the United States to condemn land in Ohio to construct a federal building—observed that eminent domain was a "means well known when the Constitution was adopted" and that "[t]he powers vested by the Constitution in the general government demand for their exercise the

acquisition of lands in all the States." *Id.*, at 371–372. *Kohl* involved the condemnation of private land, but the Court subsequently made clear that "[t]he fact that land is owned by a state is no barrier to its condemnation by the United States." *Oklahoma ex rel. Phillips* v. *Guy F. Atkinson Co.*, 313 U. S. 508, 534. Pp. 7–9.

(2) For as long as the eminent domain power has been exercised by the United States, it has also been delegated to private parties. The Colonies, the States, and the Federal Government have commonly authorized the private condemnation of land for public works. And in the years following *Kohl*, the Court confirmed that private delegatees, like the United States, can exercise the federal eminent domain power within the States. In *Luxton* v. *North River Bridge Co.*, 153 U. S. 525, for example, the Court rejected a landowner's claim that Congress could not delegate its authority to condemn property necessary to construct a bridge between New York and New Jersey. Congress had the sovereign power to construct bridges for interstate commerce, and the Court confirmed Congress could choose to do so through a corporation. *Id.*, at 530. These powers, the Court noted, could be exercised "with or without a concurrent act of the State in which the lands lie." *Ibid.* Early cases also reflected the understanding that state property was not immune from the exercise of delegated federal eminent domain power. See *Stockton* v. *Baltimore & N. Y. R. Co.*, 32 F. 9 (Bradley, Cir. J.). The contrary position—that a federal delegatee could not condemn a State's land without the State's consent—would give rise to the "dilemma of requiring the consent of the state" in virtually every infrastructure project authorized by the Federal Government. *Id.*, at 17. The Court in *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641, echoed *Stockton*'s explanation of the superior eminent domain power of the Federal Government when it rejected a challenge to a private railroad company's exercise of the federal eminent domain power against land owned by the Cherokees. In reaching that result, the Court acknowledged that "the national government, in the execution of its rightful authority, could exercise the power of eminent domain in the several States," and the Court labeled as "strange" the notion that the Federal Government "could not exercise the same power in a Territory occupied by an Indian nation or tribe." 135 U. S., at 656–657. Pp. 9–11.

(3) Section 717f(h) delegates to certificate holders the power to condemn any necessary rights-of-way, including land in which a State holds an interest. This delegation of the federal eminent domain authority is consistent with the Nation's history and this Court's precedents. FERC's issuance to a company of a certificate of public convenience and necessity to build a pipeline carries with it the power—if the company cannot acquire the necessary rights-of-way by contract at an

agreed compensation—to "acquire the same by the exercise of the right of eminent domain." §717f(h). This delegation is categorical; by its terms, §717f(h) delegates to certificate holders the power to condemn any necessary rights-of-way, including land in which a State holds an interest. Pp. 11–12.

(c) Respondents contend that sovereign immunity bars condemnation actions against a nonconsenting State. Alternatively, respondents contend that §717f(h) does not speak with sufficient clarity to authorize such actions. The Court rejects each argument, for reasons stated below. Pp. 13–22.

(1) "States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution." *Alden* v. *Maine*, 527 U. S. 706, 713. A State may be sued only in limited circumstances, including where the State expressly consents or where Congress clearly abrogates the State's immunity under the Fourteenth Amendment. A State may also be sued if it has implicitly agreed to suit in the "plan of the Convention," which is shorthand for "the structure of the original Constitution itself." *Id.*, at 728. The Court has looked to the plan of the Convention to permit actions against nonconsenting States in the context of bankruptcy proceedings, suits by other States, and suits by the Federal Government. Pp. 13–14.

(2) Respondents do not dispute that the NGA empowers certificate holders to condemn private property, but they contend that the same certificate holders have no power to condemn state-owned property under §717f(h). It is argued that the NGA cannot authorize such condemnation actions under the Court's decision in *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, which generally prohibits Congress from using its Article I powers to abrogate state sovereign immunity. But congressional abrogation is not the only means of subjecting States to suit. The States implicitly consented to private condemnation suits when they ratified the Constitution, and respondents' arguments to the contrary cannot be squared with the Court's precedents.

Respondents do not dispute that the Federal Government enjoys a power of eminent domain superior to that of the States, or that the Federal Government can delegate that power to private parties. Respondents instead point to the absence of founding-era evidence of private condemnation suits against nonconsenting States to maintain that States did not consent to such suits when they entered the federal system. Respondents would divorce the federal eminent domain power from the power to bring condemnation actions—and then argue that the latter cannot be delegated to private parties with respect to state-owned lands. But the eminent domain power is inextricably inter-

twined with condemnation authority. Separating the two would diminish the eminent domain power of the federal sovereign, which the State may not do. See *Kohl*, 91 U. S., at 374. Absent the power to condemn States' property interests, the only constitutionally permissible way of exercising the federal eminent domain power would be to take property up front and require States to sue for compensation later. State sovereign immunity would not be served by favoring private or Government-supported invasions of state-owned lands over judicial proceedings.

The Court held in *United States* v. *Texas*, 143 U. S. 621, that it "does no violence to the inherent nature of sovereignty" for a State to be sued by "the government established for the common and equal benefit of the people of all the States." *Id.*, at 646. In so holding, the Court did not insist upon examples from the founding era of federal suits against States. Similar structural considerations support the conclusion that States consented to the federal eminent domain power, whether that power is exercised by the Government or its delegatees. The absence of a perfect historical analogue to the proceedings PennEast initiated below does not suggest otherwise. Pp. 14–21.

   (3) Finally, respondents argue that even if States agreed in the plan of the Convention to condemnation suits by Federal Government delegatees, the NGA does not authorize such suits with the clarity required by the Court's precedents. There is no requirement, however, that the Federal Government speak with "unmistakable clarity" when authorizing a private party to exercise its eminent domain power. Pp. 21–22.

938 F. 3d 96, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which BREYER, ALITO, SOTOMAYOR, and KAVANAUGH, JJ., joined. GORSUCH, J., filed a dissenting opinion, in which THOMAS, J., joined. BARRETT, J., filed a dissenting opinion, in which THOMAS, KAGAN, and GORSUCH, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 19–1039

## PENNEAST PIPELINE COMPANY, LLC, PETITIONER *v.* NEW JERSEY, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 29, 2021]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Eminent domain is the power of the government to take property for public use without the consent of the owner. It can be exercised either by public officials or by private parties to whom the power has been delegated. And it can be exercised either through the initiation of legal proceedings or simply by taking possession up front, with compensation to follow. Since the founding, the United States has used its eminent domain authority to build a variety of infrastructure projects. It has done so on its own and through private delegatees, and it has relied on legal proceedings and upfront takings. It has also used its power against both private property and property owned by the States.

This case involves one of the ways the federal eminent domain power can be exercised: through legal proceedings initiated by private delegatees against state-owned property. Specifically, we are asked to decide whether the Federal Government can constitutionally confer on pipeline companies the authority to condemn necessary rights-of-way in which a State has an interest. We hold that it can.

Although nonconsenting States are generally immune from suit, they surrendered their immunity from the exercise of the federal eminent domain power when they ratified the Constitution. That power carries with it the ability to condemn property in court. Because the Natural Gas Act delegates the federal eminent domain power to private parties, those parties can initiate condemnation proceedings, including against state-owned property.

## I

## A

Natural gas has been a part of the Nation's energy supply since at least the 1820s, when an "enterprising gunsmith" named William Aaron Hart developed a natural gas well near Fredonia, New York. D. Waples, The Natural Gas Industry in Appalachia 12 (2d ed. 2012). Initially, difficulties in transporting natural gas limited its distribution, as the available pipeline technology did not allow producers to reach the sprawling American markets. See Tarr, Transforming an Energy System, in The Governance of Large Technical Systems 26 (O. Coutard ed. 1999). Over the following century, however, that technology slowly improved. In 1891, one of the first interstate pipelines—albeit a rudimentary and inefficient one—was built to carry natural gas from central Indiana to Chicago. And in the 1920s, development began in earnest on the country's pipeline infrastructure. See *id.,* at 27–28; J. Speight, Natural Gas 20–21, 26 (2007).

In 1938 Congress passed the Natural Gas Act, ch. 556, 52 Stat. 821, to regulate the transportation and sale of natural gas in interstate commerce. Congress vested the Federal Power Commission (now the Federal Energy Regulatory Commission) with the authority to administer the NGA, including by approving the construction and extension of interstate pipelines. The NGA provides that in order to build an interstate pipeline, a natural gas company must obtain

from FERC a certificate reflecting that such construction "is or will be required by the present or future public convenience and necessity." 15 U. S. C. §717f(e). The NGA also provides that, before issuing a certificate of public convenience and necessity, FERC "shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons." §717f(c)(1)(B).

As originally enacted, the NGA did not identify a mechanism for certificate holders to secure property rights necessary to build pipelines. Natural gas companies were instead left to rely on state eminent domain procedures, which were frequently made unavailable to them. In some States, the eminent domain power could be exercised only if the operation of a pipeline would benefit residents. See S. Rep. No. 429, 80th Cong., 1st Sess., 2 (1947) (collecting cases). In others, statutory and constitutional provisions denied state eminent domain power to corporations from other States. See *id.,* at 2–3. The result was that certificate holders often had only an illusory right to build.

Congress acted to remedy this defect. In 1947, it amended the NGA to authorize certificate holders to exercise the *federal* eminent domain power. See ch. 333, 61 Stat. 459. Under 15 U. S. C. §717f(h):

> "When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas . . . , it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts."

By enabling FERC to vest natural gas companies with the

federal eminent domain power, the 1947 amendment ensured that certificates of public convenience and necessity could be given effect.

## B

Petitioner PennEast Pipeline Co. is a joint venture owned by several energy companies. In 2015, PennEast applied to FERC for a certificate of public convenience and necessity authorizing the construction of a 116-mile pipeline from Luzerne County, Pennsylvania, to Mercer County, New Jersey. FERC published notice of PennEast's application in the Federal Register, and subsequently received thousands of comments in writing and at public hearings. FERC then issued a draft environmental impact statement for the project, which yielded thousands of additional comments. PennEast made a number of route modifications in response to the concerns commenters had raised.

In January 2018, FERC granted PennEast a certificate of public convenience and necessity. FERC later denied rehearing of this decision, and several parties, including respondent New Jersey, petitioned for review in the D. C. Circuit. The D. C. Circuit has held those proceedings in abeyance pending resolution of this case.

Weeks after FERC granted its application, PennEast filed various complaints in Federal District Court in New Jersey. PennEast sought to exercise the federal eminent domain power under §717f(h) to obtain rights-of-way along the pipeline route approved by FERC, and to establish just compensation for affected owners. PennEast also sought preliminary and permanent injunctive relief allowing it take immediate possession of each property in advance of any award of just compensation. As relevant here, PennEast sought to condemn two parcels in which New Jersey asserts a possessory interest, and 40 parcels in which the State claims nonpossessory interests, such as conservation easements. PennEast also sought to condemn parcels

in which respondent New Jersey Conservation Foundation holds an interest.

New Jersey moved to dismiss PennEast's complaints on sovereign immunity grounds. The District Court denied the motion, holding that New Jersey was not immune from PennEast's exercise of the Federal Government's eminent domain power. *In re PennEast Pipeline Co.*, 2018 WL 6584893, \*12 (D NJ, Dec. 14, 2018). Having denied New Jersey's motion to dismiss on immunity grounds, the District Court granted PennEast's requests for a condemnation order and preliminary injunctive relief. *Id.,* at \*21, \*26.

The Third Circuit vacated the District Court's order insofar as it awarded PennEast relief with respect to New Jersey's property interests, and it remanded for dismissal of any claims against the State. *In re PennEast Pipeline Co.*, 938 F. 3d 96, 113 (2019). Although the court acknowledged that the Federal Government can condemn state-owned property, it reasoned that this power is in fact the product of two separate powers: the Federal Government's eminent domain power, on the one hand, and its ability to sue nonconsenting States, on the other. *Id.,* at 104. While the Federal Government can delegate its eminent domain power to private parties, the court found "reason to doubt" that it can do the same with respect to its exemption from state sovereign immunity. *Id.,* at 100. After expressing skepticism as to whether the Federal Government could ever delegate this exemption, see *id.,* at 105–111, the court determined that it did not need to "definitively resolve that question," because "nothing in the NGA indicates that Congress intended to do so," *id.,* at 111. In reaching this determination, the Third Circuit relied on this Court's precedents holding that Congress cannot abrogate state sovereign immunity in the absence of an "'unmistakably clear'" statement. *Ibid.* (quoting *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 786 (1991)). Concluding that §717f(h) did not clearly delegate to certificate holders the Federal Government's

ability to sue nonconsenting States, the court held that PennEast was not authorized to condemn New Jersey's property. 938 F. 3d, at 111–113.

We granted certiorari to determine whether the NGA authorizes certificate holders to condemn land in which a State claims an interest. 592 U. S. \_\_\_ (2021).

II

We begin by addressing a jurisdictional issue raised by the United States. As just noted, the Third Circuit ruled in New Jersey's favor based on the State's statutory argument that the NGA did not delegate to certificate holders the right to file condemnation actions against nonconsenting States. The United States now argues that the Third Circuit lacked jurisdiction to decide that question under 15 U. S. C. §717r(b), which gives the court of appeals reviewing FERC's certificate order (here, the D. C. Circuit) "exclusive" jurisdiction to "affirm, modify, or set aside such order." According to the United States, New Jersey's statutory argument, if accepted, would modify FERC's order because FERC "expressly stated" in the order that PennEast "would have authority to acquire the necessary land or property to construct the approved facilities by exercising the right of eminent domain." Brief for United States as *Amicus Curiae* 15 (internal quotation marks omitted).

PennEast and the respondents both argue that the United States is wrong. We agree. New Jersey does not seek to modify FERC's order; it asserts a defense against the condemnation proceedings initiated by PennEast. To determine whether the District Court correctly rejected New Jersey's defense, the Third Circuit needed to decide whether §717f(h) grants natural gas companies the right to bring condemnation suits against States. Its conclusion that §717f(h) does not authorize such suits did not "modify" or "set aside" FERC's order, which neither purports to grant PennEast the right to file a condemnation suit against

States nor addresses whether §717f(h) grants that right. This case is thus unlike *Tacoma* v. *Taxpayers of Tacoma*, 357 U. S. 320 (1958), in which we held that the Federal Power Act's similarly worded exclusive-review provision barred a State from arguing that a licensee could not exercise the rights granted to it by the license itself. Contrary to the United States' argument, New Jersey's appeal is not a collateral attack on the FERC order.

## III

Turning to New Jersey's sovereign immunity defense, we begin by discussing the federal eminent domain power. Since the founding, the Federal Government has exercised its eminent domain authority through both its own officers and private delegatees. And it has used that power to take property interests held by both individuals and States. Section 717f(h) is an unexceptional instance of this established practice.

## A

Governments have long taken property for public use without the owner's consent. Although the term "eminent domain" appears to have been coined by Grotius, see 2 De Jure Belli ac Pacis 807 (1646 ed., F. Kelsey transl. 1925), the history of the power may stretch back to biblical times, see Bell, Private Takings, 76 U. Chi. L. Rev. 517, 524–525 (2009). In England and the early Colonies, a host of statutes authorized the use of eminent domain for the construction of roads, bridges, and river improvements, among other projects. See Stoebuck, A General Theory of Eminent Domain, 47 Wash. L. Rev. 553, 561–562 (1972). Those vested with the power could either initiate legal proceedings to secure the right to build, or they could take property up front and force the owner to seek recovery for any loss of value. See 1 Nichols on Eminent Domain §1.22[11–12] (3d ed. 2021); see also *Knick* v. *Township of Scott*, 588 U. S. \_\_\_,

___ (2019) (slip op., at 3) (contrasting "direct condemnation" with "inverse condemnation").

When the Constitution and Bill of Rights were ratified, they did not include the words "eminent domain." The Takings Clause of the Fifth Amendment ("nor shall private property be taken for public use, without just compensation") nevertheless recognized the existence of such a power. Shortly after the founding, the Federal Government began exercising its eminent domain authority in areas subject to exclusive federal jurisdiction. See, *e.g.*, Act of Mar. 3, 1809, 2 Stat. 539 (authorizing construction of turnpike road in the District of Columbia); see also *Custiss* v. *Georgetown & Alexandria Turnpike Co.*, 6 Cranch 233 (1810) (suit by one of Martha Washington's grandsons to quash inquisition into value of land pursuant to Act).

By the second half of the 19th century, however, this Court confirmed that federal eminent domain extended to property within state boundaries as well. In *Kohl* v. *United States*, 91 U. S. 367 (1876), we held that the United States could condemn land in Ohio to construct a federal building. We reasoned that "[t]he powers vested by the Constitution in the general government demand for their exercise the acquisition of lands in all the States." *Id.*, at 371. And we noted that "[t]he right of eminent domain was one of those means well known when the Constitution was adopted, and employed to obtain lands for public uses." *Id.*, at 372. The federal eminent domain power, we said, "can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised." *Id.*, at 374. And to avoid any doubt, we added that "[t]he consent of a State can never be a condition precedent to [the] enjoyment" of federal eminent domain. *Ibid.*

While *Kohl* involved the condemnation of private land, we have since explained that federal eminent domain applies to state property interests as well. In *Oklahoma ex rel. Phillips* v. *Guy F. Atkinson Co.*, 313 U. S. 508 (1941), we

upheld an Act of Congress authorizing construction of a dam and a reservoir that would inundate thousands of acres of state-owned land. There, we made explicit a point that was implicit in *Kohl*'s reasoning: "The fact that land is owned by a state is no barrier to its condemnation by the United States." 313 U. S., at 534.

## B

For as long as the eminent domain power has been exercised by the United States, it has also been delegated to private parties. It was commonplace before and after the founding for the Colonies and then the States to authorize the private condemnation of land for a variety of public works. See Bell, 76 U. Chi. L. Rev.*,* at 545; see generally, *e.g.*, Hart, The Maryland Mill Act, 1669–1766, 39 Am. J. Legal Hist. 1 (1995). The Federal Government was no different. As early as 1809, Congress authorized private parties to exercise the eminent domain power—including through the initiation of direct condemnation proceedings—within areas subject to federal jurisdiction. See *supra,* at 8; see also Act of Mar. 2, 1831, 4 Stat. 477.

In the years following *Kohl*, the Court confirmed that private delegatees can exercise the federal eminent domain power within the States as well. Our decision in *Luxton* v. *North River Bridge Co.*, 153 U. S. 525 (1894), is clear on this point. Congress authorized a corporation to build a bridge between New York and New Jersey, and to condemn property as necessary along the way. *Id.*, at 525–528 (statement of the case); see Act of July 11, 1890, ch. 669, 26 Stat. 268. Luxton—who owned land in Hoboken against which the corporation had brought condemnation proceedings—objected on the ground that Congress had unconstitutionally delegated its eminent domain power to the corporation. 153 U. S., at 527–528 (statement of the case). We rejected Luxton's challenge, explaining that Congress "may, at its dis-

cretion, use its sovereign powers, directly or through a corporation created for that object, to construct bridges for the accommodation of interstate commerce." *Id.*, at 530. These powers, we noted, could be exercised "with or without a concurrent act of the State in which the lands lie." *Ibid.*

State property was not immune from the exercise of delegated eminent domain power. In fact, this is not the first time New Jersey has tried to thwart such a delegation. In *Stockton* v. *Baltimore & N. Y. R. Co.*, 32 F. 9 (CC NJ 1887), Justice Bradley, riding circuit, considered a challenge by New Jersey to an Act of Congress authorizing a New York corporation to build a bridge on state-owned land. *Id.,* at 9–11; see Act of June 16, 1886, ch. 417, 24 Stat. 78. The Secretary of War had approved the plans for the bridge, as required by the Act, and the corporation had begun preparing for construction. 32 F., at 11. New Jersey sought an injunction, arguing among other things that an out-of-state corporation could not operate within its borders, and that the corporation could not take its land without its consent. *Id.,* at 13, 17. Justice Bradley dismissed these arguments, reasoning that "if congress, in the execution of its powers, chooses to employ the intervention of a proper corporation, whether of the state, or out of the state, we see no reason why it should not do so." *Id.*, at 14. Justice Bradley also presciently noted that New Jersey's position, if accepted, would give rise to the "dilemma of requiring the consent of the state in almost every case of an interstate line of communication by railroad, for hardly a case can arise in which some property belonging to a state will not be crossed." *Id.,* at 17.

Just a few years after *Stockton*, Justice Bradley's views were adopted by the full Court. In *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641 (1890), the Cherokees argued that a private railroad company could not exercise the federal eminent domain power pursuant to an Act

of Congress. *Id.*, at 655–656. The Act authorized the company to condemn land, including land owned by the Cherokees, through a set of procedures for determining just compensation. See Act of July 4, 1884, ch. 179, 23 Stat. 73. This Court concluded that the Cherokees' challenge was meritless. We quoted at length from *Stockton*'s discussion of the Federal Government's superior eminent domain power within the States. See 135 U. S., at 656 (quoting 32 F., at 19). And although *Stockton* involved state-owned land, whereas *Cherokee Nation* involved property owned by an Indian Tribe, the Court said that "[i]t would be very strange if the national government, in the execution of its rightful authority, could exercise the power of eminent domain in the several States, and could not exercise the same power in a Territory occupied by an Indian nation or tribe." 135 U. S.*,* at 656–657. It made no difference, moreover, that the Cherokees' property was condemned by a private delegatee, as the delegatee was "none the less a fit instrumentality to accomplish the public objects contemplated by the act." *Id.*, at 657.

## C

The cases above paint a clear picture: Since its inception, the Federal Government has wielded the power of eminent domain, and it has delegated that power to private parties. We have observed and approved of that practice. The eminent domain power may be exercised—whether by the Government or its delegatees—within state boundaries, including against state property. We have also stated, as a general matter, that "the United States may take property pursuant to its power of eminent domain in one of two ways: it can enter into physical possession of property without authority of a court order; or it can institute condemnation proceedings under various Acts of Congress providing authority for such takings." *United States* v. *Dow*, 357 U. S.

17, 21 (1958). The same is true for private delegatees. *Luxton*, for example, arose out of a condemnation proceeding initiated by a corporation, 153 U. S., at 525–528 (statement of the case), whereas *Stockton* was a suit brought by the State after preparations for construction had already begun, 32 F., at 11.

Section 717f(h) follows this path. As described above, a natural gas company must obtain a certificate of public convenience and necessity from FERC in order to build a pipeline. Once the certificate is obtained, if the company "cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way" to build the pipeline, then the company "may acquire the same by the exercise of the right of eminent domain." §717f(h). This delegation is categorical. No one disputes that §717f(h) was passed specifically to solve the problem of States impeding interstate pipeline development by withholding access to their own eminent domain procedures. See S. Rep. No. 429, at 2–4. And it was understood both at the time the provision was enacted and over the following decades that States' property interests would be subject to condemnation. See, *e.g.,* Hearings on S. 734 et al. before the Subcommittee of the Senate Committee on Interstate and Foreign Commerce, 80th Cong., 1st Sess., 105 (1947) (opponents of the bill that would become §717f(h) objecting on the ground that it would "permit[] the taking of State-owned lands used for State purposes by a private company"); *Tenneco Atlantic Pipeline Co.*, 1 FERC ¶63,025, p. 65,203 (1977) ("the eminent domain grant to persons holding [certificates of public convenience and necessity] applies equally to private and state lands"). By its terms, §717f(h) delegates to certificate holders the power to condemn any necessary rights-of-way, including land in which a State holds an interest.

IV

The respondents and the principal dissent do not dispute that the NGA empowers certificate holders to condemn private property. They argue instead that sovereign immunity bars condemnation actions against nonconsenting States. And even if such actions are constitutionally permissible, the respondents (but not the dissent) contend that §717f(h) does not speak with sufficient clarity to authorize them. We address each of these arguments in turn.

A

"States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution." *Alden* v. *Maine*, 527 U. S. 706, 713 (1999). When "the States entered the federal system," they did so "with their sovereignty intact." *Blatchford*, 501 U. S., at 779. Although the Court initially held that States could be subject to suit by citizens of other States, see *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), the ratification of the Eleventh Amendment soon corrected this error. That Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Our decision in *Hans* v. *Louisiana*, 134 U. S. 1 (1890), clarified that States retain their immunity from suit regardless of the citizenship of the plaintiff. Since *Hans*, "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms." *Blatchford*, 501 U. S., at 779.

Under our precedents, a State may be subject to suit only in limited circumstances. A State may of course consent to suit, although such consent must be "unequivocally expressed." *Sossamon* v. *Texas*, 563 U. S. 277, 284 (2011) (in-

ternal quotation marks omitted). Congress may also abrogate state sovereign immunity under the Fourteenth Amendment, *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 (1976), again assuming it does so with the requisite clarity, *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 726 (2003). And a State may be sued if it has agreed to suit in the "plan of the Convention," which is shorthand for "the structure of the original Constitution itself." *Alden*, 527 U. S., at 728; see The Federalist No. 81, pp. 548–549 (J. Cooke ed. 1961) (A. Hamilton). The "plan of the Convention" includes certain waivers of sovereign immunity to which all States implicitly consented at the founding. See *Alden*, 527 U. S., at 755–756. We have recognized such waivers in the context of bankruptcy proceedings, *Central Va. Community College* v. *Katz*, 546 U. S. 356, 379 (2006); see *Allen* v. *Cooper*, 589 U. S. ___, ___ (2020) (slip op., at 8), suits by other States, *South Dakota* v. *North Carolina*, 192 U. S. 286, 318 (1904), and suits by the Federal Government, *United States* v. *Texas*, 143 U. S. 621, 646 (1892).

### B

The respondents and the dissent argue that private parties cannot condemn state-owned property under §717f(h) because there is no applicable exception to sovereign immunity. In the dissent's view, PennEast's suit is barred because §717f(h) is just another "exercise of Congress' power to regulate interstate commerce," and "Congress cannot authorize private suits against a nonconsenting State pursuant to its Commerce Clause power." *Post,* at 4 (opinion of BARRETT, J.); see also Brief for Respondent NJCF 22–24. The dissent also contends that States did not implicitly consent to private condemnation suits when they ratified the Constitution. See *post,* at 4–7; see also Brief for Respondent NJCF 38–44; Brief for Respondent New Jersey et al. 13–22.

Beginning with the argument that Congress cannot sub-

ject States to suit pursuant to its commerce power, it is undoubtedly true under our precedents that—with the exception of the Bankruptcy Clause, see *Katz*, 546 U. S., at 379— "Article I cannot justify haling a State into federal court," *Allen*, 589 U. S., at \_\_\_ (slip op., at 7). In *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996), we held that state sovereign immunity "restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Id.*, at 72–73. *Seminole Tribe* concluded that States' inherent immunity from suit would be "eviscerated" if Congress were allowed to abrogate States' immunity pursuant to its Article I powers. *Id.*, at 64.

But congressional abrogation is not the only means of subjecting States to suit. As noted above, States can also be sued if they have consented to suit in the plan of the Convention. And where the States "agreed in the plan of the Convention not to assert any sovereign immunity defense," "no congressional abrogation [is] needed." *Allen*, 589 U. S., at \_\_\_ (slip op., at 8).

As the cases discussed in Part III show, the States consented in the plan of the Convention to the exercise of federal eminent domain power, including in condemnation proceedings brought by private delegatees. The plan of the Convention reflects the "fundamental postulates implicit in the constitutional design." *Alden*, 527 U. S., at 729. And we have said regarding the exercise of federal eminent domain within the States that one "postulate of the Constitution [is] that the government of the United States is invested with full and complete power to execute and carry out its purposes." *Cherokee Nation*, 135 U. S., at 656 (quoting *Stockton*, 32 F., at 19).

Put another way, when the States entered the federal system, they renounced their right to the "highest dominion in the lands comprised within their limits." 135 U. S., at

656 (quoting 32 F., at 19). The plan of the Convention contemplated that States' eminent domain power would yield to that of the Federal Government "so far as is necessary to the enjoyment of the powers conferred upon it by the Constitution." *Kohl*, 91 U. S., at 372. As we explained in *Cherokee Nation* (again quoting Justice Bradley in *Stockton*), "[i]f it is necessary that the United States government should have an eminent domain still higher than that of the State, in order that it may fully carry out the objects and purposes of the Constitution, then it has it." 135 U. S., at 656 (quoting 32 F., at 19). The Court left no doubt about the importance of the proposition: "This is not a matter of words, but of things." 135 U. S., at 656 (quoting 32 F., at 19). And as we have emphasized in cases involving delegations of the federal eminent domain power, Congress "may, at its discretion, use its sovereign powers, directly or through a corporation created for that object." *Luxton*, 153 U. S., at 530. PennEast's condemnation action to give effect to the federal eminent domain power falls comfortably within the class of suits to which States consented under the plan of the Convention.

The respondents and the dissent do not dispute that the Federal Government enjoys a power of eminent domain superior to that of the States. Nor do they dispute that the Federal Government can delegate that power to private parties. They instead assert that the only "question is whether Congress can authorize a private party to bring a condemnation suit against a State." *Post,* at 5; see Brief for Respondent NCJF 40; Brief for Respondent New Jersey et al. 15. And they argue that because there is no founding-era evidence of such suits, States did not consent to them when they entered the federal system. See *post,* at 5–7; Brief for Respondent NCJF 39–42; Brief for Respondent New Jersey et al. 13–16.

The flaw in this reasoning is that it attempts to divorce

the eminent domain power from the power to bring condemnation actions—and then argue that the latter, so carved out, cannot be delegated to private parties with respect to state-owned lands. But the eminent domain power is inextricably intertwined with the ability to condemn. We have even at times equated the eminent domain power with the power to bring condemnation proceedings. See *Agins* v. *City of Tiburon*, 447 U. S. 255, 258, n. 2 (1980), abrogated on other grounds by *Lingle* v. *Chevron U. S. A. Inc.*, 544 U. S. 528, 532 (2005). Separating the eminent domain power from the power to condemn—when exercised by a delegatee of the Federal Government—would violate the basic principle that a State may not diminish the eminent domain authority of the federal sovereign. See *Kohl*, 91 U. S., at 374 ("If the United States have the power, it must be complete in itself. It can neither be enlarged nor diminished by a State.").

If private parties authorized by the Federal Government were unable to condemn States' property interests, then that would leave delegatees with only one constitutionally permissible way of exercising the federal eminent domain power: Take property now and require States to sue for compensation later.* It is difficult to see how such an arrangement would vindicate the principles underlying state sovereign immunity. Whether the purpose of that doctrine is to "shield[] state treasuries" or "accord the States the respect owed them as joint sovereigns," *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743,

———————

*In addition, all agree that Congress could authorize FERC itself to condemn the exact same property interests, pursuant to the exact same certificate of public convenience and necessity, and then transfer those interests to PennEast following a legal proceeding in which the Government would presumably act in concert with PennEast. See *post,* at 7 (opinion of Barrett, J.); Brief for Petitioner 40; Brief for Respondent New Jersey et al. 43–46. This further highlights the counterintuitive nature of the constitutional scheme envisioned by the respondents and the dissent.

765 (2002) (internal quotation marks omitted), it would hardly be served by favoring private or Government-supported invasions of state-owned lands over judicial proceedings.

Perhaps sensing the incongruity of such a result, New Jersey has taken the extreme stance that there is *no* constitutional mechanism for Federal Government delegatees to exercise the eminent domain power against the States. See Tr. of Oral Arg. 86. This position is untenable. "[J]ust as permission to harvest the wheat on one's land implies permission to enter on the land for that purpose," A. Scalia & B. Garner, Reading Law 192 (2012), so too does authorization to take property interests imply a means through which those interests can be peaceably transferred. An eminent domain power that is incapable of being exercised amounts to no eminent domain power at all. And that is contrary to the plan of the Convention for the reasons discussed in *Kohl*, *Stockton*, *Cherokee Nation*, and *Luxton*.

The dissent, for its part, declines to say whether Congress could authorize a certificate holder to take possession of state property through upfront entry. See *post,* at 7–8, and n. 3. The dissent gestures at other judicial and administrative procedures that delegatees might be able to use to take state property. See *post,* at 8, n. 3. But such procedures would almost certainly meet the same fate as traditional condemnation actions under the dissent's analysis. See *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 760–761 (2002).

Furthermore, the respondents and the dissent prove too much by emphasizing the historical absence of private condemnation suits against state-owned lands. As a preliminary matter, they appear to cast doubt on the provenance of the Federal Government's ability to exercise its eminent domain power within the States. See *post,* at 6; Brief for Respondent NCJF 40–42; Brief for Respondent New Jersey et al. 16–18. But we resolved in *Kohl* and its progeny that

the Federal Government has such an ability—including against state-owned property—and that the exercise of the federal eminent domain power was a means that was "known and appropriate" at the time of the founding. 91 U. S., at 372. We made very clear that this conclusion was unaffected by the fact that the federal eminent domain power had "not heretofore been exercised adversely" within the States, because "the non-user of a power does not disprove its existence." *Id.,* at 373.

The respondents and the dissent recognize, moreover, that States consented in the plan of the Convention to suits by the Federal Government, even though that proposition was not established until 1892 in *United States* v. *Texas.* See *post,* at 6–7; Brief for Respondent NCJF 37; Brief for Respondent New Jersey et al. 20–21; see also *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 329 (1934); *Blatchford*, 501 U. S., at 781–782. The Court in *Texas*—which was decided even more recently than *Kohl*, *Stockton*, and *Cherokee Nation*—did not insist upon examples from the founding era of federal suits against States. The Court instead reasoned as a structural matter that such suits were authorized because it "does no violence to the inherent nature of sovereignty" for a State to be sued by "the government established for the common and equal benefit of the people of all the States." 143 U. S., at 646. The structural considerations discussed above likewise show that States consented to the federal eminent domain power, whether that power is exercised by the Government or its delegatees. And that is true even in the absence of a perfect historical analogue to the proceedings PennEast initiated below.

The dissent argues that the Court in *Texas* relied not only on "constitutional structure," but also on "textual cues." *Post,* at 6. But the only relevant constitutional text in *Texas* was a grant of federal jurisdiction, and that cannot explain States' implicit consent in the plan of the Convention to

suits by the Federal Government. If it could, then the extension of the judicial power to controversies "between a State and Citizens of another State," Art. III, §2, cl. 1, would suggest that *Chisholm* v. *Georgia* correctly held that nonconsenting States could be subject to private suit. And the existence of federal jurisdiction over controversies "between a State . . . and foreign States," Art. III, §2, cl. 1, would suggest that States consented in the plan of the Convention to suit by other nations, notwithstanding our holding to the contrary in *Principality of Monaco* v. *Mississippi*. A grant of judicial power does not imply an abrogation of sovereign immunity. *Texas* rested on "the consent of the State" in the constitutional plan, as does our decision today. 143 U. S., at 646.

As a final point, the other dissent offers a different theory—that even if the States consented in the plan of the Convention to the proceedings below, the Eleventh Amendment nonetheless divests federal courts of subject-matter jurisdiction over a suit filed against a State by a diverse plaintiff. See *post,* at 3–4 (opinion of GORSUCH, J.). But under our precedents that no party asks us to reconsider here, we have understood the Eleventh Amendment to confer "a personal privilege which [a State] may waive at pleasure." *Clark* v. *Barnard*, 108 U. S. 436, 447 (1883); see, *e.g., Lapides* v. *Board of Regents of Univ. System of Ga.*, 535 U. S. 613, 618–619 (2002); *Gunter* v. *Atlantic Coast Line R. Co.*, 200 U. S. 273, 284 (1906). When "a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action." *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 238 (1985). Such consent may, as here, be "'inherent in the constitutional plan.'" *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation*, 496 U. S. 18, 30 (1990) (quoting *Principality of Monaco*, 292 U. S., at 329); see, *e.g., Katz*, 546 U. S., at 377–378.

## C

We conclude by addressing the respondents' argument (which the dissent does not join) that even if States agreed in the plan of the Convention to condemnation suits by Federal Government delegatees, the NGA does not authorize such suits with the requisite clarity. The Third Circuit adopted this position below, concluding that §717f(h) did not use the "unmistakably clear" language necessary to delegate the Federal Government's ability to sue nonconsenting States. 938 F. 3d, at 111 (quoting *Blatchford*, 501 U. S., at 786); 938 F. 3d, at 111 ("If Congress had intended to delegate the federal government's exemption from sovereign immunity, it would certainly have spoken much more clearly."). The respondents renew their contention before this Court. See Brief for Respondent NCJF 24–31; Brief for Respondent New Jersey et al. 31–39. They note that we have required "unequivocal textual evidence" when determining whether a State has expressly consented to suit, or when evaluating whether Congress has validly abrogated state sovereign immunity under the Fourteenth Amendment. *Id.,* at 32 (citing *Sossamon*, 563 U. S., at 291; *Hibbs*, 538 U. S., at 726). And they argue that this requirement should apply with equal force in the context of private condemnation actions against nonconsenting States.

The respondents are certainly correct that a clear statement is required to subject States to suit in the waiver and abrogation contexts. But they have again misconstrued the issue in this case as whether the United States can delegate its ability to sue States. The issue is instead whether the United States can delegate its eminent domain power to private parties. Regardless whether the Federal Government must speak with unmistakable clarity when delegating its freestanding exemption from state sovereign immunity (assuming such a delegation is even permissible, see *Blatchford*, 501 U. S., at 785), there is no similar re-

quirement when the Federal Government authorizes a private party to exercise its eminent domain power. The respondents do not dispute that the federal eminent domain power can be delegated, or that §717f(h) speaks with sufficient clarity to delegate the power to condemn privately owned land. They argue only that §717f(h) fails to delegate the power to condemn States' property interests. But the federal eminent domain power is "complete in itself," *Kohl*, 91 U. S., at 374, and the States consented to the exercise of that power—in its entirety—in the plan of the Convention. The States thus have no immunity left to waive or abrogate when it comes to condemnation suits by the Federal Government and its delegatees.

V

When the Framers met in Philadelphia in the summer of 1787, they sought to create a cohesive national sovereign in response to the failings of the Articles of Confederation. Over the course of the Nation's history, the Federal Government and its delegatees have exercised the eminent domain power to give effect to that vision, connecting our country through turnpikes, bridges, and railroads—and more recently pipelines, telecommunications infrastructure, and electric transmission facilities. And we have repeatedly upheld these exercises of the federal eminent domain power—whether by the Government or a private corporation, whether through an upfront taking or a direct condemnation proceeding, and whether against private property or state-owned land.

The NGA fits well within this tradition. From humble beginnings in central Indiana, the Nation's interstate pipeline system has grown to span hundreds of thousands of miles. This development was made possible by the enactment of §717f(h) in 1947. By its terms, §717f(h) authorizes FERC certificate holders to condemn all necessary rights-of-way, whether owned by private parties or States. Such

Opinion of the Court

condemnation actions do not offend state sovereignty, because the States consented at the founding to the exercise of the federal eminent domain power, whether by public officials or private delegatees. Because the Third Circuit reached a contrary conclusion, we reverse the judgment below and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–1039

_____

## PENNEAST PIPELINE COMPANY, LLC, PETITIONER *v.* NEW JERSEY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 29, 2021]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, dissenting.

I join JUSTICE BARRETT's dissenting opinion in full, which ably explains why this case implicates New Jersey's structural immunity and how New Jersey never waived that immunity in the summer months of 1787. I write only to address one recurring source of confusion in this area and which the Court does not address. In the same breath, the district court said an Eleventh Amendment objection "is a challenge to a district court's subject matter jurisdiction" and yet "it does not implicate federal subject matter jurisdiction." App. to Pet. for Cert. 64–65. Both statements cannot be true. This Court, it seems, has contributed to the confusion. It has "sometimes referred to the States' immunity from suit as 'Eleventh Amendment immunity.'" *Alden* v. *Maine*, 527 U. S. 706, 713 (1999); see also, *e.g., ante*, at 20. Though it might be a "convenient shorthand," the phrase is "a misnomer." *Alden*, 527 U. S., at 713. States have two distinct federal-law immunities from suit.[1]

_____

[1] States may also have *state-law* immunity from suit in a state forum. That immunity derives from a State's "sole control" of "its own courts." *Alden*, 527 U. S., at 740, 749. A State is free to develop its own justiciability rules governing state tribunals. See *Missouri* v. *Lewis*, 101 U. S. 22, 30 (1880); *ASARCO Inc.* v. *Kadish*, 490 U. S. 605, 617 (1989). That

The first—"structural immunity"—derives from the structure of the Constitution.  See *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___, ___ (2019) (slip op., at 16).  Because structural immunity is a constitutional entitlement of a sovereign State, it applies in both federal tribunals, *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 51–52 (1996), and in state tribunals, *Alden*, 527 U. S., at 712.  And it applies regardless of whether the plaintiff is a citizen of the same State, *Allen* v. *Cooper*, 589 U. S. ___, ___ (2020) (slip op., at 2), a citizen of a different State, or a *non*-citizen—like a foreign nation, *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 330 (1934), or an Indian tribe, *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 781 (1991).  Structural immunity sounds in personal jurisdiction, so the sovereign can waive that immunity by "consent" if it wishes.  *Hyatt*, 587 U. S., at ___–___ (slip op., at 6–7); see *Wisconsin Dept. of Corrections* v. *Schacht*, 524 U. S. 381, 394 (1998) (Kennedy, J., concurring).

The second—what is properly termed "Eleventh Amendment immunity"—derives from the text of the Eleventh Amendment.  In light of its swift adoption in response to *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), this Court has read the Eleventh Amendment as pointing to the structural principle just discussed.  See *Allen*, 589 U. S., at ___ (slip op., at 4).  But the Eleventh Amendment can do two things at once.  See *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 753 (2002).  In addition to pointing us back to the States' structural immunity, it also provides an ironclad rule for a particular category of diversity suits:

"The Judicial power of the United States shall not be

––––––––––

is why this Court has found that state-law immunity provides an adequate and independent state ground for affirming a state-court judgment.  *E.g., Georgia R. & Banking Co.* v. *Musgrove*, 335 U. S. 900 (1949) (*per curiam*); *Palmer* v. *Ohio*, 248 U. S. 32, 34 (1918).  Because PennEast sued in federal court, state-law immunity is not implicated here.

construed to extend to any suit in law or equity, com-
menced or prosecuted against one of the United States
by Citizens of another State, or by Citizens or Subjects
of any Foreign State." U. S. Const., Amdt. 11.

This text "means what it says. It eliminates federal judicial
power over one set of cases: suits filed against states, in
law or equity, by diverse plaintiffs." Baude & Sachs, The
Misunderstood Eleventh Amendment, 169 U. Pa. L. Rev.
609, 612 (2021).

The Eleventh Amendment sometimes does less than
structural immunity: It applies only in federal court ("the
Judicial power *of the United States*"). And it applies only to
diversity suits ("by Citizens of *another State*"). But some-
times the Amendment does more: It imposes an Article III
subject-matter jurisdiction barrier ("The judicial *Power . . .
shall not* be construed to *extend*"), not a mere privilege of
personal jurisdiction. And it admits of no waivers, abroga-
tions, or exceptions ("to *any suit* in law or equity").

This case appears to present "the rare scenario" that
comes within the Eleventh Amendment's text. Brief for Re-
spondent State of New Jersey 12. Because PennEast sued
New Jersey in federal court, this suit implicates "the Judi-
cial power of the United States." See 28 U. S. C. §§132, 451.
This condemnation suit, by any stretch, is "a[ ] suit in law
or equity." See *Kohl* v. *United States*, 91 U. S. 367, 376
(1876) ("a proceeding to take land" and "determin[e] the
compensation to be made" is "a suit at common law"); *Boom
Co.* v. *Patterson*, 98 U. S. 403, 406–407 (1879) (same). Pen-
nEast "commenced" this suit "against" New Jersey. It
named the State in its complaint as a defendant as required
by the Civil Rules. Fed. Rule Civ. Proc. 71.1(c)(1). And it
asked the court for an injunction permitting it to take "im-
mediate possession" of New Jersey's soil. *Hagood* v. *South-
ern*, 117 U. S. 52, 67–68 (1886) ("The State is not only the
real party to the controversy, but the real party against

which relief is sought by the suit."). Because the parties agree that PennEast is a citizen of Delaware, this suit is brought "by [a] Citizen[ ] of another State." See Tr. of Oral Arg. 25–27; see also *State Farm Fire & Casualty Co.* v. *Tashire*, 386 U. S. 523, 531 (1967).

If that's all true, then a federal court "shall not" entertain this suit. The Eleventh Amendment's text, no less than the Constitution's structure, may bar it. This Court, understandably, does not address that issue today[2] because the parties have not addressed it themselves and "there is no mandatory 'sequencing of jurisdictional issues.'" *Sinochem Int'l Co.* v. *Malaysia Int'l Shipping Corp.*, 549 U. S. 422, 431 (2007). The lower courts, however, have an obligation to consider this issue on remand before proceeding to the merits. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 94–95, 101 (1998).

---

[2] What the Court does say, in a drive-by rumination on the waivability of "the Eleventh Amendment," pertains to *structural* immunity. *Ante*, at 20. All of the cases it cites fall outside of the Eleventh Amendment's text. The Court's language, then, conflating structural immunity and Eleventh Amendment immunity furnishes just the latest example of the "misnomer" this Court already put to bed in *Alden*. *Supra,* at 1.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–1039

_____

## PENNEAST PIPELINE COMPANY, LLC, PETITIONER *v.* NEW JERSEY, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 29, 2021]

JUSTICE BARRETT, with whom JUSTICE THOMAS, JUSTICE KAGAN, and JUSTICE GORSUCH join, dissenting.

A straightforward application of our precedent resolves this case. Congress passed the Natural Gas Act in reliance on its power to regulate interstate commerce, and we have repeatedly held that the Commerce Clause does not permit Congress to strip the States of their sovereign immunity. Recognizing that barrier, the Court insists that eminent domain is a special case. New Jersey has no sovereign immunity to assert, it says, because the States surrendered to private condemnation suits in the plan of the Convention. This argument has no textual, structural, or historical support. Because there is no reason to treat private condemnation suits differently from any other cause of action created pursuant to the Commerce Clause, I respectfully dissent.

I

As a "general rule," Congress cannot circumvent state sovereign immunity's limitations on the judicial power through its Article I powers. *Allen* v. *Cooper*, 589 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 7). Thus, even in areas where Article I grants it "complete lawmaking authority," Congress lacks a tool that it could otherwise use to implement its power:

"authorization of suits by private parties against uncon-senting States." *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 72 (1996). Consistent with this principle, we have re-jected arguments that the Indian Commerce Clause, the In-terstate Commerce Clause, or the Intellectual Property Clause allows Congress to abrogate a State's immunity from suit. *Ibid.*; *Allen*, 589 U. S., at ___–___ (slip op., at 6–7).

We have recognized but one exception to this general limit on Congress' Article I powers: the Bankruptcy Clause. *Id.*, at ___ (slip op., at 7). Based on the "principally *in rem*" nature of bankruptcy jurisdiction and the "'unique history'" of that clause, we reasoned that States "already 'agreed in the plan of the Convention not to assert any sovereign im-munity defense' in bankruptcy proceedings." *Id.*, at ___–___ (slip op., at 7–8) (quoting *Central Va. Community College* v. *Katz*, 546 U. S. 356, 377 (2006)). Other than this "good-for-one-clause-only holding," we have not held that Article I trumps state sovereign immunity. *Allen*, 589 U. S., at ___ (slip op., at 9).[1]

State surrender of immunity to private suits is therefore rare in our constitutional system. Nonetheless, the Court insists that private condemnation suits are one of the rare exceptions.

## II
## A

According to the Court, the States surrendered their im-munity to private condemnation suits in the "plan of the Convention." *Ante,* at 15. Making this showing is no easy task. We will not conclude that States relinquished their sovereign immunity absent "compelling evidence that the

―――――――

[1] Apart from Article I, we have recognized that Congress can subject nonconsenting States to private suits pursuant to its power to enforce the Fourteenth Amendment. *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 (1976).

Founders thought such a surrender inherent in the constitutional compact." *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 781 (1991).

The Court accepts PennEast's argument that there is such compelling evidence here. The reasoning goes like this: States "surrendered any immunity from the federal government's eminent-domain power in the plan of the convention"; when they did so, "they were consenting to that power as it was then 'known'"; and "[a]t the Founding, eminent domain was universally known as a power that could be delegated to private parties." Brief for Petitioner 23, 33. So, the argument concludes, the States "were consenting to a power that the federal government could exercise either itself or through delegations to private parties." *Id.*, at 34. The States "simply do not have any immunity to invoke in this context." *Id.*, at 23.

These premises warrant clarification. *First*, the Constitution enumerates no stand-alone "eminent-domain power."[2] The Court recognizes—as does our precedent—that the Federal Government may exercise the right of eminent domain only "so far as is necessary to the enjoyment of the powers conferred upon it by the Constitution." *Kohl* v. *United States*, 91 U. S. 367, 372 (1876); see *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819). Any taking of property provided for by Congress is thus an exercise of another constitutional power—in the case of the Natural Gas Act, the Commerce Clause—augmented by the Necessary and Proper Clause. So when Congress allows a private party to take property in service of a federally authorized project, it is choosing a means by which to carry an enumerated power into effect.

*Second*, the assertion that the States "surrendered any

──────────
[2] The Takings Clause of the Fifth Amendment is a limitation on Government power, not a grant of it. It provides: "[N]or shall private property be taken for public use, without just compensation." It thus presumes that the power exists by virtue of other constitutional provisions.

immunity from the federal government's eminent-domain power in the plan of the convention" implies that eminent domain occupies a unique place in the constitutional structure. Brief for Petitioner 23; accord, *ante,* at 14–16 (opinion of the Court). But as just explained, a taking is a garden-variety exercise of an enumerated power like the Commerce Clause. The Federal Government can exercise that power to take state land. *Oklahoma ex rel. Phillips* v. *Guy F. Atkinson Co.*, 313 U. S. 508, 534 (1941). And it can take that land via a condemnation action against a nonconsenting State not because eminent domain is special, but for the same reason it can sue a nonconsenting State in any other proceeding: "States have no sovereign immunity as against the Federal Government." *West Virginia* v. *United States*, 479 U. S. 305, 311 (1987) (citing *United States* v. *Texas*, 143 U. S. 621, 646 (1892)). The special structural principles the Court conjures are illusory.

So while the Court casts the inquiry as one about the scope of the States' consent to the Federal Government's "eminent-domain power," that is the wrong way to think about the problem. Here is the right way: Title 15 U. S. C. §717f(h) is an exercise of Congress' power to regulate interstate commerce. Congress cannot authorize private suits against a nonconsenting State pursuant to its Commerce Clause power. *Seminole Tribe*, 517 U. S., at 72–73. Nor does the Commerce Clause itself abrogate state sovereign immunity. Cf. *Allen*, 589 U. S., at ___–___ (slip op., at 8–9). Therefore, Congress cannot enable a private party like Penn-East to institute a condemnation action against a nonconsenting State like New Jersey.

B

The Court's proposed escape route from this analysis— that the States relinquished their immunity from private condemnation suits in the plan of the Convention—is a dead end. There is no "Eminent Domain Clause" on which

the Court can rely. Cf. *Katz*, 546 U. S., at 372–373 (holding that "those who crafted the Bankruptcy Clause" understood it to "operat[e] free and clear of the State's claim of sovereign immunity"); *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 (1976) (holding that state sovereign immunity is necessarily limited by the enforcement provision of the Fourteenth Amendment); *South Dakota* v. *North Carolina*, 192 U. S. 286, 314–318 (1904) (holding that Article 3, §2, gives the Supreme Court jurisdiction over a suit brought by one State against another); *Texas*, 143 U. S., at 642–646 (holding that Article 3, §2, gives the Supreme Court jurisdiction over a suit brought by the United States against a State). Nor, as discussed, does the constitutional structure single out eminent domain for special treatment. And while the Court claims the support of history, the evidence it cites is beside the point.

The Court relies exclusively on the fact that Congress and the States, like the Colonies before them, have consistently authorized private parties to exercise the right of eminent domain to obtain property for mills, roads, and other public improvements. See *ante,* at 9–11. As the Court notes, Congress did so in the early days of the Republic only within "areas subject to exclusive federal jurisdiction," though we later held that Congress could take property within state boundaries as well. *Ante*, at 8–9. This history is long and undisputed, and the Court presents it as conclusive evidence on PennEast's side of the ledger.

But the question before us is not whether Congress can authorize a private party to exercise the right of eminent domain against another private party, which is the proposition this history supports. Nor is it whether Congress can authorize a private entity to take state property through means other than a condemnation suit. The question is whether Congress can authorize a private party to bring a condemnation suit against a State. And on that score, the Court comes up dry.

The Court cannot muster even a *single* decision involving a private condemnation suit against a State, let alone any decision holding that the States lack immunity from such suits.  It relies exclusively on suits brought by States, suits brought by the United States, suits brought by private parties against other private parties, and suits brought by Indian tribes against private parties—none of which implicate state sovereign immunity.  See *Kohl*, 91 U. S. 367 (suit by United States); *Guy F. Atkinson Co.*, 313 U. S. 508 (suit by Oklahoma); *Luxton* v. *North River Bridge Co.*, 153 U. S. 525 (1894) (suit by private company to condemn private land); *Stockton* v. *Baltimore & N. Y. R. Co.*, 32 F. 9 (CC NJ 1887) (suit by New Jersey); *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641 (1890) (suit by Cherokee Nation against private company).

Moreover, no one disputes that for 75 years after the founding, it was unsettled whether the Federal Government could even exercise eminent domain over *private land* within a State.  See Baude, Rethinking the Federal Eminent Domain Power, 122 Yale L. J. 1738, 1741, 1761–1777 (2013).  It was then 77 years more before we held that "[t]he fact that land is owned by a state is no barrier to its condemnation by the United States."  *Guy F. Atkinson Co.*, 313 U. S., at 534.  Given the length of time that these questions lingered, it strains credulity to say that history unequivocally establishes that States surrendered their immunity to private condemnation suits in the plan of the Convention.

The Court downplays "the historical absence of private condemnation suits against state-owned lands," noting that we did not rely on historical examples when we held that States consented in the plan of the Convention to suits by the Federal Government.  *Ante,* at 18–19 (citing *Texas*, 143 U. S. 621).  But in that decision, the supremacy of the Federal Government in our constitutional structure, along with textual cues, were sufficient to resolve the question.  *Id.*, at 644–646.  Here, there is no basis for drawing an analogous

structural inference, much less any remotely relevant text. *Supra,* at 3–4. History is the only place left to look for evidence that States consented to private condemnation suits in the plan of the Convention. See, *e.g., Katz*, 546 U. S., at 362–363. None exists—which means that the Court falls far short of mustering the "compelling evidence" necessary to show that a surrender of immunity to private condemnation suits was "inherent in the constitutional compact." *Blatchford*, 501 U. S., at 781.

C

The Court rejects this conclusion on the ground that state immunity from private condemnation suits would render the federal eminent domain power incomplete. *Ante,* at 16–18 (stating that the power must be "'complete in itself'"). The Court is wrong.

To begin with, sovereign immunity would not permit States to obstruct construction of a federally approved pipeline. No one disputes that in our constitutional structure, the Federal Government is supreme within its realm. Art. VI, cl. 2. At the same time—and this is the proposition that the Court resists—the Constitution limits the means by which the Federal Government can impose its will on the States. Thus, while the Tenth Amendment imposes no bar on the federal taking of state land, *Guy F. Atkinson Co.*, 313 U. S., at 534, the Eleventh Amendment imposes a bar on Congress' ability to accomplish that taking through a private condemnation suit like this one. That does not leave the Federal Government without options. In fact, there is an obvious option that the Court barely acknowledges: The United States can take state land itself. See *ibid.*

A direct taking, however, is not enough for the Court, which—continuing to cast eminent domain as a stand-alone power—claims that allowing a State to assert an immunity defense in a private condemnation suit would "diminish the eminent domain authority of the federal sovereign." *Ante,*

at 17.  If private parties cannot sue nonconsenting States, the Court says, delegatees would have no practical means of taking state property.[3]  And that is inconsistent with the Constitution, the Court tells us, because "[a]n eminent domain power that is incapable of being exercised amounts to no eminent domain power at all." *Ante,* at 18.  The flaw in this logic is glaring: The eminent domain power belongs to the United States, not to PennEast, and the United States is free to take New Jersey's property through a condemnation suit or some other mechanism.

State sovereign immunity indisputably makes it harder for Congress to accomplish its goals, as we have recognized many times before.  For example, Congress cannot abrogate state sovereign immunity to pursue the "proper Article I concerns" of "provid[ing] a uniform remedy for patent infringement and [placing] States on the same footing as private parties under that regime." *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627, 647–648 (1999).  Nor can it authorize private suits against States to "'secur[e]' a copyright holder's 'exclusive Right[s]' as against a Stat[e]," *Allen*, 589 U. S., at ___ (slip op., at 6) (quoting U. S. Const., Art. I, §8, cl. 8), or to ensure that States negotiate in good faith with Indian tribes, *Seminole Tribe*, 517 U. S., at 47, 72.  The same is true here: Sovereign immunity limits how Congress can obtain state property for pipelines.  This inhibition of Congress is not,

------

[3] The Court claims that allowing States to assert sovereign immunity "would leave delegatees with only one constitutionally permissible way of exercising the federal eminent domain power: Take property now and require States to sue for compensation later." *Ante,* at 17.  But there are myriad mechanisms for obtaining land through eminent domain, and this case gives us no occasion to consider which, if any, are available to delegatees.  See*, e.g.*, 6A J. Sackman, Nichols on Eminent Domain §27.02[2] (3d ed. 2019) ("[I]n 1931, there were approximately 269 different methods of judicial procedure in different classes of condemnation cases, and there were 56 methods of non-judicial or administrative procedure in condemnation cases").

however, a reason to set sovereign immunity aside. It is instead a deliberately chosen feature of the constitutional design.

## III

While the Court cloaks its analysis in the "plan of the Convention," it seems to be animated by pragmatic concerns. Congress judged private condemnation suits to be the most efficient way to construct natural gas pipelines, and to this point, States have cooperated. *Ante,* at 3–4. But now that New Jersey has chosen to object, it threatens to "thwart" federal policy. *Ante,* at 10. If the Court sided with New Jersey and Congress did not amend §717f(h), New Jersey (not to mention other States) could hold up construction of the pipeline indefinitely. And even if §717f(h) were amended, a new statutory procedure might be less efficient than permitting PennEast to sue New Jersey directly. Holding New Jersey immune from suit thus would reward its intransigence.

Our precedents provide a ready response: The defense of sovereign immunity *always* has the potential of making it easier for States to get away with bad behavior—like copyright infringement, *Allen*, 589 U. S., at \_\_\_–\_\_\_ (slip op., at 2–4), patent infringement, *Florida Prepaid*, 527 U. S., at 630–634, and even reneging on debts, *Chisholm* v. *Georgia*, 2 Dall. 419, 430 (1793). Indeed, concern about States using sovereign immunity to thwart federal policy is precisely why many Justices of this Court have dissented from our sovereign immunity jurisprudence. See, *e.g.*, *Seminole Tribe*, 517 U. S., at 77 (Stevens, J., dissenting) (objecting that the majority's holding "prevents Congress from providing a federal forum for a broad range of actions against States, from those sounding in copyright and patent law, to those concerning bankruptcy, environmental law, and the regulation of our vast national economy"). The availability of the defense does not depend on whether a court approves

of the State's conduct.

The Court also brushes past New Jersey's interests by failing to acknowledge that §717f(h) actions implicate state sovereignty. PennEast has haled a State into court to defend itself in an adversary proceeding about a forced sale of property. See 6A J. Sackman, Nichols on Eminent Domain §27.01[1][b] (3d ed. 2019) ("A condemnation is an adversary proceeding that the federal government initiates against the owners to take their property"). As required by Federal Rule of Civil Procedure 71.1(c), PennEast named New Jersey in this suit. Even if the State could, as PennEast contends, refuse to appear and still retain its right to compensation, it is difficult to see how the initiation of a judicial proceeding that seeks to wrest title to state property from the State does not subject the State to coercive legal process. Cf. *United States* v. *Alabama*, 313 U. S. 274, 282 (1941).

Moreover, obtaining title is not necessarily a cut-and-dry matter. New Jersey points out that there is sometimes litigation—as there was here—about whether the property sought falls within the FERC certificate. Brief for State Respondents 24–25. Compensation, too, can be a matter of dispute. The State and the plaintiff are unlikely to see eye to eye on what the property is worth, and there is often a battle of the experts about the property's value. See 4 Sackman, Nichols on Eminent Domain §13.01[1][b][i] ("Establishing the value of real estate requires a valuation expert"); *ibid.* ("'Valuation of property is not an exact process and courts are often greeted with conflicting appraisal testimony'"). If PennEast gets title at a bargain, New Jersey will suffer a loss even if no money leaves its treasury.

## IV

It would be very odd for the government's right to take property for public use to exist only if private parties can exercise it. That, however, is the Court's position. And by

adopting it, the Court is able to make a §717f(h) action sound like something other than what it is: a private suit against a State that Congress has authorized pursuant to its commerce power. This Court has long held that States did not surrender their sovereign immunity to suits authorized pursuant to Congress' power to regulate interstate commerce, and no historical evidence suggests a different result obtains for condemnation suits brought by private parties against nonconsenting States. Because state sovereign immunity bars these suits, I respectfully dissent.